Eloise Pepion COBELL,
et al., Plaintiffs,

v.

Bruce BABBITT, Secretary of the Interior, Lawrence Summers, Secretary of the Treasury, and Kevin Gover, Assistant Secretary of the Interior, Defendants.

No. 96–1285.

United States District Court,
District of Columbia.

Dec. 21, 1999.

**4**

Dennis M. Gingold, Washington, DC, Thaddeus Holt, Point Clear, AL, Elliott H. Levitas, Atlanta, GA, Keith Harper, Lorna K. Babby, Washington, DC, for Plaintiffs.

Lois J. Schiffer, Assistant Attorney General, Tom C. Clark, II, Senior Counsel, Phillip A. Brooks, Senior Counsel, Charles Findlay, Assistant Chief, U.S. Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBERTH, District Judge.

This matter comes before the court after a six-week bench trial and the submission of an administrative record, proposed findings of fact and conclusions of law by both sides, and responses thereto. Upon consideration of these materials and the record in this case, the court makes the following findings of fact and conclusions of law.

*Table of Contents*

I. *Introduction* ................................................................. 6
II. *Findings of Fact* ............................................................ 7
 A. *History Surrounding IIM Trust Establishment* ........................... 7
 B. *The IIM Trust* ......................................................... 9
 C. *The Indian Trust Fund Management Reform Act of 1994* .................. 12

 D. *The Strategic Plan* ........................................... 13
 E. *The High Level Implementation Plan (HLIP)* ........................ 14
 1. *Data Cleanup* ........................................... 14
 a. *OST Trust Fund Records Data Cleanup* .................. 14
 b. *BIA Trust Asset Records Data Cleanup* .................. 15
 2. *BIA and OHA Probate Backlog* ............................ 17
 3. *BIA Appraisal Program* ................................. 18
 4. *Computer Systems* ..................................... 18
 a. *OST Trust Fund Accounting System (TFAS)* .............. 18
 b. *BIA Trust Asset and Accounting Management System (TAAMS)*.... 19
 5. *OST/BIA Records Management* ............................ 20
 F. *Facts Pertaining to Plaintiffs' Interference Claims* ...................... 21
 G. *The Department of the Treasury* ................................ 21
 1. *Time Lapse in Availability of Deposited Funds* ................. 22
 2. *Loss of Interest on Issued Checks* .......................... 22
 3. *Illegal Document Retrieval and Retention Policies* ................ 23
 4. *The Sweeping of Money into the Unclaimed Moneys and Miscellaneous Receipts Accounts at Treasury* ............................ 23
 III. *Jurisdiction and Scope of Lawsuit* ................................. 24
 A. *Subject Matter Jurisdiction* ................................. 24
 B. *Waiver of Sovereign Immunity* ............................... 24
 C. *Plaintiffs' Common–Law Claims for Breach of Trust* .................. 28
 D. *Scope of Lawsuit* ........................................ 31
 E. *APA "Jurisdiction"* ....................................... 35
 F. *Administrative Record* .................................... 37
 IV. *Declaratory Judgment—Basic Principles* ............................. 38
 V. *Declaratory Judgment—The Secretary of the Interior* .................... 40
 A. *Overview* ............................................. 40
 B. *Declaration of Trust Duties Arising from the Indian Trust Fund Management Reform Act* .................................... 40
 1. *The Secretary of the Interior's Duty to Perform Accounting on All IIM Trust Money* ..................................... 40
 2. *The Secretary of the Interior's Duty to Establish Written Plans for Gathering of Missing Information; Document Retention; Business and Computer Systems Architecture; and Staffing of Trust Management Functions* ................................ 41
 (i.) *Introduction* ...................................... 41
 (ii.) *document retrieval and retention* ...................... 42
 (iii.) *systems architecture and staffing* ..................... 43
 C. *The Deadline for the Discharge of the Secretary of the Interior's Four Declared Planning Duties Has Passed* ......................... 45
 D. *The Secretary of the Interior is Currently in Breach of Four Statutory Trust Duties that Warrant Prospective Relief* ..................... 48
 1. *The Secretary of the Interior Has No Written Plan to Gather Missing Data* ......................................... 48
 2. *The Secretary of the Interior Has No Written Plan Addressing the Retention of IIM–Trust Documents Necessary to Render an Accounting* ......................................... 49
 3. *The Secretary of the Interior Has No Written Architecture Plan* ......... 49
 4. *The Secretary of the Interior Has No Written Plan Addressing the Staffing of Interior's Trust Management Functions* .................. 49
 VI. *Declaratory Judgment—The Secretary of the Treasury* .................... 49
 A. *The Secretary of the Treasury's Duty to Retain IIM–Trust Documents that are Necessary for the Rendition of an Accounting* .................... 49
 B. *The Secretary of the Treasury Has Breached His Fiduciary Duty to Retain IIM–Trust Documents and Has No Remedial Plan to Address This Breach of Duty* ...................................... 50
 VII. *Plaintiffs' Obstruction Claims* .................................. 51
VIII. *Remedy* ................................................ 52
 IX. *Certification of Order for Interlocutory Appeal* ......................... 57
 X. *Conclusion* ............................................. 57

## I. *Introduction* [1]

It would be difficult to find a more historically mismanaged federal program than the Individual Indian Money (IIM) trust. The United States, the trustee of the IIM trust, cannot say how much money is or should be in the trust. As the trustee admitted on the eve of trial, it cannot render an accurate accounting to the beneficiaries, contrary to a specific statutory mandate and the century-old obligation to do so. More specifically, as Secretary Babbitt testified, an accounting cannot be rendered for most of the 300,-000–plus beneficiaries, who are now plaintiffs in this lawsuit. Generations of IIM trust beneficiaries have been born and raised with the assurance that their trustee, the United States, was acting properly with their money. Just as many generations have been denied any such proof, however. "If courts were permitted to indulge their sympathies, a case better calculated to excite them could scarcely be imagined." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 15, 8 L.Ed. 25 (1831) (Marshall, C.J.).

Notwithstanding all of this, defendants, the trustee-delegates of the United States, continue to write checks on an account that they cannot balance or reconcile. The court knows of no other program in American government in which federal officials are allowed to write checks—some of which are known to be written in erroneous amounts—from unreconciled accounts—some of which are known to have incorrect balances. Such behavior certainly would not be tolerated from private sector trustees. It is fiscal and governmental irresponsibility in its purest form.

The United States' mismanagement of the IIM trust is far more inexcusable than garden-variety trust mismanagement of a typical donative trust. For the beneficiaries of this trust did not voluntarily choose to have their lands taken from them; they did not willingly relinquish pervasive control of their money to the United States. The United States imposed this trust on the Indian people. As the government concedes, the purpose of the IIM trust was to deprive plaintiffs' ancestors of their native lands and rid the nation of their tribal identity. The United States reaped the "benefit" of this imposed program long ago—sixty-five percent of what were previously tribal land holdings quickly opened up to non-Indian settlement. But the United States has refused to act in accordance with the fiduciary obligations attendant to the imposition of the trust, which are not imposed by statute.

The defendants cannot provide an accounting of plaintiffs' money, which the United States has forced into the IIM trust. This problem, which has been handed down from administration to administration of apologetic United States trustee-delegates to generation upon generation of helpless beneficiaries, continues today and is the basis for this lawsuit. It imposes far more than pecuniary costs, although those are clear and cannot be overstated. Plaintiffs' class includes some of the poorest people in this nation. Human welfare and livelihood are at stake. It is entirely possible that tens of thousands of IIM trust beneficiaries should be receiving different amounts of money—their own money—than they do today. Perhaps not. But no one can say, which is the crux of the problem.

Plaintiffs bring this lawsuit to force the government to abide by its duty to render

**1.** The background and history of this lawsuit have been discussed at length in four previous opinions in this case. *See Cobell v. Babbitt,* 188 F.R.D. 122 (D.D.C. Aug.10, 1999) (assessing reasonable attorneys' fees against defendants for civil contempt of court); *Cobell v. Babbitt,* 52 F.Supp.2d 11 (D.D.C. June 7, 1999) (denying defendants' motions for summary judgment); *Cobell v. Babbitt,* 37 F.Supp.2d 6 (D.D.C.1999) (finding defendants Babbitt, Rubin, and Gover in civil contempt of court for failure to comply with court orders); *Cobell v. Babbitt,* 30 F.Supp.2d 24 (D.D.C.1998) (granting in part and denying in part, *inter alia,* defendants' motions to dismiss).

an accurate accounting of the money currently held within the IIM trust. But plaintiffs must remember that this is a lawsuit. They cannot treat the court as a grievance committee for the United States' mishandling of the trust. Whether plaintiffs like it or not, only Congress can play that type of role. For everyone involved must consider not only plaintiffs' rights, but also the constitutional role of courts in American government. This court can consider only plaintiffs' soundly grounded causes of action, and it cannot provide relief beyond them. The component of the case currently before the court concerns the issue of whether defendants are in breach of any trust duties such that plaintiffs should be afforded some prospective relief to prevent further injury of their legal rights. Plaintiffs have stated and proved certain valid legal claims that entitle them to relief.

For the reasons stated below, the court finds that the United States government, by virtue of the actions of defendants and their predecessors, is currently in breach of certain trust duties owed to plaintiffs. The government recently has taken substantial steps toward bringing itself into compliance in several respects. Nonetheless, given the long and sorry history of the United States' trusteeship of the IIM trust, the defendants' recalcitrance toward remedying their mismanagement despite decades of congressional directives, and the consequences of allowing these enumerated breaches of trust to continue, the court will retain continuing jurisdiction over this matter. It would be an abdication of duty for this court to do anything less.

II. *Findings of Fact*

A. *History Surrounding IIM Trust Establishment*

As Chief Justice Marshall noted in 1831, the United States–Indian relationship is "perhaps unlike that of any two people in existence" and "marked by peculiar and cardinal distinctions which exist nowhere else." *Cherokee Nation*, 30 U.S. at 16, 8 L.Ed. 25. In the early 1800s, the United States pursued the policy of "removal"-*i.e.*, the relocation of tribal communities from their homelands in the East and Midwest to remote locations in the newly acquired Louisiana Purchase territory. Trial Tr. at 846. In 1824, the Bureau of Indian Affairs (BIA) was created to implement that removal policy.[2] Trial Tr. at 152–53; 846. For the majority of the Nineteenth Century, the federal government entered into a series of treaties and agreements identifying the lands owned by the tribes. These treaties and agreements were frequently violated or amended to reduce Indian holdings and to open more land to non-Indian settlers. Trial Tr. at 848–49. During this time period, the tribes held their land communally, so there was very little individual ownership of land. Non–Indian land, whether communally or individually owned, could be sold without the approval of the federal government. Trial Tr. at 849–50.

By the late 1870s, the government had embarked upon the reservation era. This era was a particularly miserable time for the Indians because the reservation policy deprived Indians of their traditional economy and made them dependent upon the federal government. Trial Tr. at 851–52. During the reservation era, the BIA became the provider of foods and goods to the tribes. Trial Tr. at 852. Hence, by the 1870s, the government had successfully placed Native Americans in a state of coerced dependency.

After this relationship of dependency between the United States and the Indian people was forcibly established, the allotment era began. Driven by a greed for

---

**2.** BIA was originally named the "Office of Indian Affairs" and was placed in the United States' Department of War.

the land holdings of the tribes, Congress passed the 1887 General Allotment Act, also known as the Dawes Act. *See* 25 U.S.C. § 348. Through the allotment process established by the Dawes Act, a delegation of American "peace commissioners" would negotiate with the tribes for the allotment of their reservations. The tribes were compensated for their land, and each head of household was allotted some amount of property, usually in 40-, 80-, or 160-acre parcels. The "surplus" lands that were not allotted to Indian individuals were then opened to non-Indian settlement. Trial Tr. at 852–56. Allotted land was held in trust by the United States for the individual Indians. Therefore, the Indians could not lease, sell, or burden their property without the approval of the federal government. More importantly, the United States had again successfully managed to deprive the Indian people of more land, this time in return for the creation of a trust status. Between 1887 and 1934, 90 million acres—about sixty-five percent of Indian land—left Indian ownership. Trial Tr. at 857–57.

The allotments were the product of the United States' effort to eradicate Indian culture. As defendant Gover testified:

> the thinking was that it was tribalism that held the Indians back; that what they needed to do was develop the sort of individualism that had been so beneficial for the United States in its expansion, and allotment was the way to do that. But ... the things that accompanied allotment ... were really even more dreadful than the allotment policy itself.
>
> For example, there was a system of boarding schools established, and suddenly the Indian people were subject to these mandatory education requirements imposed by the Bureau of Indian Affairs. These schools were run by the Bureau of Indian Affairs, and they would take these kids away from their families, put them in these boarding schools. They might or might not see

their parents again for years, or ever. Train them in English. They forbade them their native languages. They forbade them their religions. They cut their hair, and they dressed them ... like non-Indian kids would be dressed, and literally tried to turn them into white people.

> \* \* \* \* \* \*

> They were so confident in this assimilation policy that there was actually a sunset in most of the allotment agreements that said after 25 years the trust patents will be withdrawn, you'll be issued a fee patent, each individual who owned this land, and you will go forth and prosper. You will own the land outright, and may do with it what you wish.

Trial Tr. at 855–57.

In 1934, another major shift in federal policy toward Indians occurred. With the enactment of the Indian Reorganization Act of 1934, the federal government reversed its assimilation policy and directed BIA to rebuild the tribal communities and government structures. *See* 25 U.S.C. § 462. This new policy ended the allotment era and authorized the Secretary of the Interior to acquire land in trust for the tribes and for individual Indians. The Reorganization Act also indefinitely extended the trust period for the allotments that had already been made, which is why the United States has a continuing duty to administer allotted Indian lands (and the funds arising from those lands) in trust today. Trial Tr. at 863.

Less than two decades after the Reorganization Act was passed, in the early 1950s, congressional policy swung in a new direction. According to Assistant Secretary Gover, "this time the policy was called the 'termination policy.' Termination basically meant the severing of the relationship between the tribe and the United States, and, specifically, the severing of the trust relationship." Trial Tr. at 864. Congress directed BIA to identify tribes that were

said to be "ready for termination, ready to be released from federal supervision because by this point the conclusion had been reached that the real problem with Indian affairs, and the real reason the Indians are poor is that they're under the thumb of the federal government." Trial Tr. at 864. Following that direction, the United States withdrew recognition of the existence of certain tribes and forswore any responsibility to those tribes or their people as Indians. The tribal assets were gathered up and either administered by a corporate entity or distributed among the tribal members. Much like the allotment policy, this policy devastated the tribal communities. Trial Tr. at 864–67. The termination policy ended quickly. After the 1960s, no further tribes were terminated. Trial Tr. at 867.

The end of the termination policy brought about the onset of the modern era of Indian policy: self-determination and self-governance. Beginning in the 1960s, tribal governments began to reconstitute themselves and take over governmental programs. The highlight of this policy was the enactment in 1975 of the Indian Self–Determination and Education Assistance Act, which permits tribes to assume any of the functions BIA carries out on the reservation. Upon proper request, BIA must contract with that tribe to conduct any such function in lieu of BIA. Trial Tr. at 867–68. BIA can refuse to grant the contract only if the tribe does not have the proper accounting system or the proper property management or administration capabilities to carry out the contract. If BIA finds that the tribe does not have those capabilities, then BIA is obligated to provide technical assistance to the tribe in order to help it develop the capacity to carry out the contract.

Tribes may also assume those functions performed by Office of Trust Fund Management (OTFM) with regard to IIM trust accounts, through a contract or compact with Interior. To date, three tribes have compacted to manage IIM trust accounts.

Trial Tr. at 309 & 1376. Under the Self–Determination Act, if BIA contracts with a tribe to allow that tribe to perform a function, the financial resources that BIA would use in providing that service, including the overhead, are transferred to the tribe. In essence, these funds, which represent almost seventy percent of BIA's budget, just pass through BIA to the tribes. Trial Tr. at 870–71; 881–82; Defs.' Ex. 47.

### B. The IIM Trust

As a result of the allotments made from 1887–1934 and the Indians Reorganization Act's indefinite extension of the resulting trust period, the United States currently holds approximately 11 million acres of plaintiffs' individual land allotments in trust. Trial Tr. at 903–04. The United States itself is the trustee of the IIM trust. Congress has designated the Secretary of the Interior and the Secretary of the Treasury as the United States' trustee-delegates for certain trust management functions. Within Interior, several agencies perform some IIM trust function. These agencies include the Bureau of Indian Affairs (BIA), the Office of the Special Trustee (OST), the Office of Trust Funds Management (OTFM), the Bureau of Land Management (BLM), the Minerals Management Service (MMS), and the Office of Hearings and Appeals (OHA).

BIA generally has responsibility for trust land management and income collection. Almost any transaction involving IIM trust lands must be approved by BIA. To make these approvals, BIA maintains personnel to review the transfers of those lands and to appraise the lands in conjunction with those transactions. There are also income-producing activities on many of these lands, including grazing leases, timber leases, timber sales, oil and gas production, mineral production, and rights-of-way. Each of these activities requires the approval of BIA. Trial Tr. at 116–17; 123; 127; 904–05. These activities are the source of IIM trust funding. Given BIA's

role, it logically follows that it is responsible for maintaining complete and accurate land and title records. These records, in theory, provide the basis for IIM trust payments, which are controlled by OTFM.

OTFM, in conjunction with the Department of the Treasury, performs the banking aspect of Interior's trust responsibilities. Trial Tr. at 126. OTFM and BIA collection officers collect payments and send them to an agency or area office for deposit in a private bank where there is a Treasury General Account.[3] Trial Tr. at 1239–40. MMS deposits its collections into a Treasury General Account and then notifies OTFM by facsimile of the deposit. Trial Tr. at 1242. Once the deposits are posted on the OTFM system, OTFM credits the amounts either to an IIM trust account holder or to a special deposit account, depending upon the information contained in work tickets prepared by the collection officers. Trial Tr. at 1237–41.[4]

There are over 300,000 IIM trust accounts on Interior's system. Trial Tr. at 114–15; 542–43. Interior cannot provide the exact number of IIM trust accounts that should be on this system. This number could increase (assuming greater omissions than duplicates) or decrease (assuming greater duplicates than omissions). Plaintiffs contend that there should be approximately 500,000 IIM trust accounts. While the overall number of accounts is quite large, it is important to note that OTFM has identified 16,700 IIM trust accounts with a stated balance below one dollar and no activity for at least eighteen months. Trial Tr. at 320–21 & 1287. Of course, it is a farce to say that these accounts actually contain any given

amount. Although the United States freely gives out "balances" to plaintiffs, it admits that currently these balances cannot be supported by adequate transactional documentation.

As mentioned above, OTFM may also credit income from allotted lands to a special deposit account. A special deposit account is a holding account within the IIM trust system where money is placed for safekeeping because, for a variety of reasons, it cannot or should not be paid to an IIM trust account holder. In addition, special deposit accounts are quite often used to hold performance bonds or other money subject to a contingency. Trial Tr. at 487–89; 1045; 1242–44. Administrative fees collected by BIA are also often put in special deposit accounts. The administrative fees belong to BIA, not individual Indians, and therefore the fees in these special deposit accounts is not trust money. Trial Tr. at 1045–46; 1246–47.[5] Further, in many areas, funds are placed in a special deposit account while BIA's ownership and lease file is reviewed to make sure that it is current. Then, in an overnight process, those funds are released from the special deposit account into the individual IIM trust accounts. Trial Tr. at 1245–46.

Once OTFM has credited the appropriate IIM trust or special deposit accounts, at the end of each day several automatic processes begin. First, overnight, funds credited to unsupervised IIM trust accounts, if they meet a monetary threshold of $15.00 ($5.00 for oil and gas), are automatically identified and a check file is created.[6] The next day, Interior prints and

---

3. Other methods of income collection include the use of paper lockboxes and electronic lockboxes. Trial Tr. at 2216–20.

4. In addition to income from allotted lands, the IIM trust accounts may sometimes hold per capita payments from judgments or funds from other special legislation. Trial Tr. at 114.

5. The IIM trust system at one time also included special deposit accounts that arose

from the Indian Monies Proceeds of Labor (IMPL) accounts. The interest on IMPL accounts was deposited into special deposit accounts when the principal was disbursed to the individual Indians. Trial Tr. at 485–86. The IMPL accounts were abolished in the early 1980s. Trial Tr. at 610.

6. A supervised account is one that has a hold on disbursements for various reasons: an account holder who is a minor or *non compos*

mails a check to the IIM trust account holder. Trial Tr. at 1250–51. Second, also overnight, the balances in supervised accounts or in accounts with a balance below the threshold are automatically moved into a control account and, the next day, invested in the Treasury overnight instrument, awaiting longer term investments. Trial Tr. at 1247–49; 1304.[7] Interest earned on these investments is credited once a month to the individual accounts or the special deposit accounts.[8] Trial Tr. at 1247–49; 1304.

Other bureaus of Interior perform functions associated with the management of the assets (i.e., the management of the trust lands). For instance, MMS acts as the collection agent for oil, gas, coal, and other types of royalty payments once a lease is in effect. Trial Tr. at 122. BLM checks for environmental compliance on trust lands and verifies certain mineral production figures. Trial Tr. at 124–25. OHA handles the probate of wills affecting Indian land ownership.

Treasury's IIM trust responsibilities include holding and investing IIM trust funds at the direction of Interior, as well as maintaining certain records related to these functions. Of course, Treasury also performs central accounting for the federal government and serves as the government's financial manager. Trial Tr. at 3297–99.

Treasury maintains a single account for IIM trust funds, known generally as the "IIM account," and does not maintain individualized IIM trust or special deposit accounts. Trial Tr. at 1240; 1247; 3312. This common fund is pooled for investment purposes. The IIM trust account at Treasury, which holds funds for OTFM prior to disbursement or investment, is maintained in the name of OTFM. Trial Tr. at 1240; 3309–11; Pls.' Ex. 181. When Interior deposits funds for credit to the IIM trust account, the funds themselves go into Treasury's operating account at the Federal Reserve Bank of New York. Trial Tr. at 2204. Like the accounts in which money is deposited at the area or agency level, this account is referred to as Treasury's General Account or TGA. At the time of deposit, Interior does not tell Treasury to which agency account the deposit should be credited. Trial Tr. at 2211–12. Rather, Interior reports deposits to Treasury by Agency Location Code (ALC). An ALC is a code assigned by Treasury to an agency and is used by the agency to report financial transactions. Trial Tr. at 2209. The typical ALC used by OTFM is 4844. Trial Tr. at 3312.

Because it covers transactions made at a higher organizational level, the 4844 ALC covers more than just IIM trust transactions. Trial Tr. at 732 & 2209. Each agency is responsible for classifying its own deposits placed into the TGA and for reporting this information on a monthly basis to Treasury.

Also at the end of the month, Treasury reports to the agency certain summary-level accounting information. Trial Tr. at 1254 & 3309. This information consists of overall totals by account, as opposed to detailed information about individual transactions. Trial Tr. at 3299–3300. Again, because of the ALC system, Trea-

---

mentis, a court order, a tribal credit hold, or another hold. Trial Tr. at 1251–52.

7. Individuals with account balances below the threshold balance can still obtain their funds but must present themselves in person to a BIA or OTFM office and present proof of identity or send a notarized request by mail. Trial Tr. at 1252; 1674.

8. There is an approximate $42 million overdraft in interest payments made out of this investment account to beneficiaries due to defendants' poor record keeping and management practices. Trial Tr. at 150. This means that some beneficiaries have received a windfall, while other beneficiaries have not had the benefit of the interest from the money that should have been invested for their benefit (since it is a common fund). Trial Tr. at 150. The $42 million figure was a reduction from approximately $80 million in the early 1990s.

sury keeps only summary-level accounting information; OTFM keeps the individualized accounting records. Trial Tr. at 3299–3300. OTFM uses Treasury's information to reconcile its own records. Trial Tr. at 1254. Thus, Treasury's records are important to a proper accounting of plaintiffs' trust money.

The Treasury General Account at the Federal Reserve Bank is a cash account, but the various agency accounts maintained at Treasury do not actually hold funds. Trial Tr. at 3390. Instead, amounts are debited and credited to the various agency accounts only as accounting entries. Pursuant to standard procedures for dual-entry accounting, a deposit of IIM trust funds ultimately leads to offsetting accounting entries to the TGA and the IIM trust account. Trial Tr. at 4908. Conversely, a disbursement of IIM trust funds ultimately results in offsetting accounting entries to these accounts. Trial Tr. at 4908–09. More precisely, the issuance of a check (by OTFM) leads to offsetting entries to the IIM trust account and an outstanding check liability account. Payment of a check leads to offsetting entries to the checks-outstanding account and to the TGA. Trial Tr. at 4908–09. No entry is made to the TGA for an issued check until it actually is paid. Disbursements of IIM trust funds are charged against the IIM trust account. Trial Tr. at 3394.

When directed by Interior, funds in the IIM account are to be invested by Treasury:

> All funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of individual Indians shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior,

and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable securities.

25 U.S.C. § 161a(b).[9] When OTFM issues a check, the funds remain in the TGA, so the United States still enjoys the benefit of the trust money; however, until the check is cashed, the amount is debited from the invested fund, thereby depriving the beneficiary of any interest. Although this time lapse may be short in the private sector, it can be much longer in the IIM trust context because OTFM often has incorrect addresses for the recipients.

### C. The Indian Trust Fund Management Reform Act of 1994

By the mid–1980s there was uniform disapproval of the manner in which Interior was administering the IIM trust. In 1988, Congress began to hold oversight hearings related to the handling of government trust accounts. On April 22, 1992, the House Committee on Government Operations issued a report entitled *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund*, H.R. No. 102–499 (1992) (Pls.' Ex. 1). This thoroughly documented report concluded that Interior had made no credible effort to address the problems in trust administration in a "wide range of areas" and that Interior had disobeyed many congressional directives aimed at forcing Interior to correct trust management practices and reconcile the Indian trust accounts. Pls.' Ex. 1.

In response to these criticisms, Interior, through the accounting firm Arthur Andersen, conducted a study to determine whether the IIM trust and tribal trust accounts could be reconciled simultaneously. In an initial report, Arthur Andersen concluded that, within certain parameters,

---

9. Interior also has authority to withdraw the funds from the IIM account and invest them with commercial entities. 25 U.S.C. § 162a.

Interior invests through Bankers Trust. Trial Tr. at 3380.

the tribal accounts could be reconciled, but that the IIM trust system would pose a far more difficult task, perhaps costing over $200 million. Trial Tr. at 529–30; Trial Tr. at 318–19. Even that expenditure would have yielded only a "reconciliation" of approximately eighty-five percent reliability.

Based largely on the findings made in *Misplaced Trust*, Congress passed the Indian Trust Fund Management Reform Act. *See* Pub.L. No. 103–412 (1994) (Pls.' Ex. 1). The Act recognized and codified the trust duties of the Secretary of the Interior, as the primary trustee-delegate of the United States, toward the IIM trust. *See* 25 U.S.C. §§ 162a(d) & 4011 (Supp.1999); *see also infra* Part IV (listing these duties).

Because Congress recognized that Interior's pattern of historic failures could not be allowed to continue, the 1994 Trust Fund Management Reform Act established within Interior the Office of the Special Trustee for American Indians. OST is headed by the Special Trustee, who reports directly to the Secretary. 25 U.S.C. § 4042(a). To advise the Secretary and to help oversee defendants' trust management practices, Congress limited the availability of the position of Special Trustee to those people with certain statutory job qualifications, which were meant to ensure that a trust expert capable of assisting the Secretary would fill the position. *See id.* § 4042(b)(1). This trust expert was to submit his version of a "comprehensive strategic plan" that would provide the reforms necessary to ensure "proper and efficient discharge of the Secretary of the Interior's trust responsibilities to Indian tribes and individual Indians." *Id.* § 4043(a)(1). Similarly, the Strategic Plan was to identify reforms necessary to ensure "discharge of the Secretary's trust responsibilities" in compliance with the 1994 Trust Fund Management Reform Act, to provide an opportunity for Indian tribes to assist in the management of trust accounts, and to identify a timetable for implementing the Strategic Plan. *Id.* § 4043(a)(2).

Congress charged the Special Trustee with "general oversight of reform efforts," but he was given no final decision making authority, as that was left with the Secretary of the Interior. *Id.* § 4042(a). The Special Trustee was given several duties, including the monitoring of the "fair and accurate accounting" of the trust accounts. *Id.* § 4043(b). Moreover, Congress required the Special Trustee to submit an annual report to Congress reporting on Interior's progress in discharging its statutory duties. *Id.* § 4043(f). However, despite the wishes of several influential legislators and the plaintiffs in this case, the Trust Fund Management Reform Act vested the Special Trustee with largely an advisory role. While the Special Trustee must oversee reform, coordinate the reform efforts, and keep Congress informed, the Special Trustee must still report to the Secretary. This limited authority is consistent with the language of the Trust Fund Management Reform Act and the mandate of 25 U.S.C. § 162a(d). In that section, Congress placed many of the United States' enumerated trust responsibilities on the Secretary of the Interior; logically, the same person who bears the trust duties must be given the ultimate authority to discharge them. *See* Defs.' Resp. to Pls.' FF/CL at 168.

### D. *The Strategic Plan*

In July 1995, President Clinton nominated Paul Homan to be the first Special Trustee under the Act. Trial Tr. at 109; Defs.' Ex. 106. In April 1997, the Special Trustee submitted his final Strategic Plan to the Secretary and to Congress. The Strategic Plan concluded that the "government increasingly was unable to keep pace with the rapid changes and improvements in technology, trust systems and prudential best practices taking place in the private sector trust industry." Pls.' Ex. 4 at 3. The Special Trustee's Strategic Plan

called for a new Indian Development Bank and for a centralized Indian Fiduciary Records Center, both of which would have been substantial organizational changes and would have required legislation.

After the Strategic Plan's issuance, Secretary Babbitt met with the Special Trustee to discuss how to handle the Indian trust problems. The Secretary, as the official with final decision making authority, decided to take an approach whereby those portions of the Strategic Plan that did not require new institutions would be implemented. Defs.' Ex. 28; Defs.' Ex. 29; *see also* Trial Tr. at 331–32; 2938; 3705–06. The Secretary called for the implementation of the following components of the Strategic Plan: (1) acquisition/upgrade of trust systems; (2) records "cleanup"; (3) elimination of trust asset processing backlogs; and (4) strengthening support functions, including records, policies and procedures, training, and internal controls. The Secretary "deferred" three items: (1) new management and organization structures outside Interior; (2) introducing new trust products or services based on the prudent investor rule; and (3) an Indian development bank. Defs.' Ex. 28; Trial Tr. at 2942 & 3712.

### E. *The High Level Implementation Plan (HLIP)*

The HLIP plays a key role in this case not as Interior's plan to reform the IIM trust, but rather as Interior's most comprehensive plan to discharge its trust duties. The HLIP consists of twelve "subprojects," only a few of which are central to the court's purposes of determining the propriety of affording plaintiffs prospective relief.

### 1. *Data Cleanup*

As set forth in numerous congressional reports and the HLIP itself, Interior has had significant data quality and backlog problems during its tenure as the United States' primary trustee-delegate for the IIM trust. *See* Defs.' Ex. 45, at 10. These problems have largely caused the systemic flaws that survive to this date. Document management is the single biggest issue that must be comprehensively addressed if plaintiffs are to be assured any practical prospective assurance that their trustee will be able to give them an accurate accounting. As the Acting Special Trustee testified, "[t]he records are the base for the entire trust operation." Trial Tr. at 3164.

### a. *OST Trust Fund Records Data Cleanup*

Under the HLIP, OST data cleanup focuses on one discreet data issue—deriving the beneficiaries' vital information, such as names, addresses, and Social Security numbers.[10] This information is to be gathered, in theory, by taking all the paper documentation contained in the administrative files, which should contain all the necessary vital statistical information, and reconciling that information with the data contained on the "legacy" electronic data bases: the Integrated Records Management System (IRMS) and the Land Record Information System (LRIS).[11] This process is to take place before loading the correct vital information into the new Trust Fund Accounting System (TFAS). Trial Tr. at 1258. Because of document mismanagement by Interior, achieving this basic goal involves several steps. First, OST will acquire the records, jacket folders, and unfiled documents from OTFM's IIM trust offices across the country. Trial

---

**10.** In 1998, some specific examples of vital information deficiencies included: (1) over 5,500 IIM trust accounts in existence for "minors" that have actually reached the age of majority; (2) over 46,000 IIM trust accounts without current addresses for the beneficiary; (3) over 123,000 IIM trust accounts lacking a

Social Security number or tax identification number. *See* Defs.' Ex. 45, at 10.

**11.** The "legacy" systems, LRIS and IRMS, are the systems in operation today. *See infra* subpart III(E).

Tr. at 1262; Defs.' Ex. 62 at 12.[12] Second, OST will establish inventory control of the files. Third, OST will inventory the documents for inactive or closed accounts.[13] Fourth, the data-cleanup team will move on to verifying certain data and reviewing active accounts. Specifically, Data Com Inc., Interior's contractor, will look at the physical file folders and verify that OTFM has the most current address, Social Security number, and back-up documentation by comparing that data to the information contained in the computer system. If a discrepancy exists between the papers in the file and the information on the computer, then Data Com will refer the discrepancy to OTFM, with a recommended change. Trial Tr. at 1270–72.

To guide this process, OTFM has created a policy on mandatory documents. A mandatory document is something that OTFM must have to properly manage that account (such as the certificate of Indian blood and social security number). Trial Tr. at 1273–75; Defs.' Ex. 63. If any of the mandatory documents are missing during file review, the contractor at the completion of cleanup will contact other agencies in an attempt to gather copies of the missing documents. Trial Tr. at 1276–77.

Once OST, through Data Com, completes this initial vital-information cleanup of files, the BIA area offices will be ready for TFAS to be installed. Even after TFAS is installed in a particular location, however, OTFM will still need to locate and file additional vital documentation. Trial Tr. at 1293. Data cleanup, as that phrase refers to the jacket files, is continu-ing post-deployment. OTFM, aided by its contractor, will visit BIA agencies, contact tribal offices, and write to IIM trust account holders to confirm or correct vital information. OTFM will also attempt to locate account holders for whom it does not have current addresses by contacting agencies and tribal officials, publishing lists of such account holders, and posting these lists on OTFM's World Wide Web Internet site. Trial Tr. at 1277–78; 1322; 1398–99; 1810. Once the vital documentation is completed, the files will be imaged so that they can be reviewed by authorized users at any BIA location in the country. After the documents are imaged, the hard copies are sent to the central records center. Trial Tr. at 1293.

In short, Interior's data-cleanup project addresses two problems that have been allowed to accumulate up to this point—the unknown identities of the beneficiaries, to whom defendants should be sending (their own) money, and the "whereabouts unknowns" (*i.e.*, lack of correct addresses) for the mailing of these payments. That defendants need to undertake such a sophisticated plan just to identify that which they should already know speaks volumes about the current state of IIM trust management.

b. *BIA Trust Asset Records Data Cleanup*

Interior's goal for BIA is to "have a level of data in the system that allows for proper land title records and every allottee and every tribe to receive the correct dollars that they're supposed to get." Trial

---

12. In connection with records management, in a separate project, Interior is consolidating in Albuquerque all of the financial information it has relating to the IIM trust account transactions. Trial Tr. at 1262–63. These documents are needed to perform the accounting.

13. An inactive account is one that was closed prior to January 1, 1996. Accounts that have been closed since January 1, 1996 are maintained on the system. The files relating to inactive accounts are boxed, inventoried, and sent to the document center maintained by the Office of Trust Litigation Support and Records. Trial Tr. at 1265–66. Since January 1, 1996, accounts have been coded as closed when they have a zero balance, such as when all funds were disbursed when a minor came of age or an account holder died and the probate was settled. In addition, if there is no income coming into a small account, OTFM will attempt to close the account and distribute the proceeds so that the account can be coded as closed.

Tr. at 2504. As is the case for OTFM, data cleanup for BIA's TAAMS, the new Trust Asset and Accounting Management System, is being performed by Data Com. Trial Tr. at 2274. The high-level phases in this cleanup include: (1) assessing the area offices to determine what needs to be done; (2) establishing metrics for a particular area and any training that may be necessary to assist the data-cleanup needs at the area; (3) pre-deployment cleanup; (4) performing post-deployment cleanup; and (5) utilizing verification and audit procedures to determine data accuracy rates and whether additional cleanup activities are warranted. Trial Tr. at 2275–76; 2765–66; 2769; Pls.' Ex. 238, at 3, 7, 8, 20–22.

Pre-deployment data cleanup strictly involves validating the data already contained in the two legacy systems. This process is accomplished with the help of an automated tool that compares the data in IRMS and LRIS and "kicks out" anomalies. These anomalies are not eligible for migration to the TAAMS system; instead, they will be analyzed and resolved by a team of Data Com and BIA staff and then encoded into TAAMS. Trial Tr. at 1083–85; 2278; 2307–08; 2627; 2769.

The pre-deployment BIA document cleanup is narrowly focused. The pre-deployment phase does not address the problem of missing data. Similarly, this phase will not catch errors unless the two legacy systems contain inconsistent information. As long as the systems are similarly incorrect, no validation of data will be made at this point, despite the admitted unreliability of the legacy systems' data. Nonetheless, this narrow focus is a logical starting point.

Given the pre-deployment phase's purpose, data cleanup must continue after the implementation of TAAMS (*i.e.*, "post-deployment"). Post-deployment data cleanup for BIA includes the continued processing of paperwork backlogs in each BIA office. Pls.' Ex. 238 at 7.

Making the two (correct) assumptions for the moment that defendants owe plaintiffs an accurate accounting and that defendants are missing a share of necessary documents to reach that end, then it follows that defendants must retrieve documents from outside sources, also referred to as third-party documents. Defendants currently have no written plan for doing so. Interior's most specific plan for BIA data cleanup is Plaintiffs' Exhibit 238, a draft "Data Clean Up Subproject Plan," created no earlier than May 1, 1999. As described above, the plan contains five document clean-up phases, two of which are the already described pre- and post-deployment phases. The fifth and final phase is entitled "Verification and Audit." Pls.' Ex. 238, at 26. While this phase sounds like a sterile accounting exercise, it is truly the most important and challenging phase. Due to the backloaded construction of the BIA document clean-up plan, because no previous phase includes a plan for retrieving all of the missing data required to give plaintiffs an accurate accounting, this last phase encompasses the only hope for a planned retrieval of missing data from third-party sources.

It is not clear, even at the highest level of planning, whether Interior intends to gather these third-party documents, which are necessary to support an accounting. For example, Interior's fifth phase includes the following:

> After TAAMS has been populated with BIA data, the records in TAAMS need to be verified to ensure that they are complete and accurate to the greatest extent practical. This task is scheduled to be performed subsequent to the conversion to TAAMS, and will involve verifying the data in TAAMS against hardcopy records, other hardcopy sources, and available reliable sources of information.

*Id.* at 15. First, it can be readily seen that this statement does not explicitly provide for missing data to be retrieved if BIA does not already have it. Only the records

"in TAAMS" will be verified and audited, and no previous phase calls for TAAMS to be "populated" with outside information. *Id.; see also* Defs.' Ex. 45 ("Data Clean Up Defined. The Data Clean Up Sub projects within OST and BIA are aimed at ensuring data *housed in existing or new systems* are accurate and timely, and at eliminating transaction *processing backlogs* ...." (emphasis added)). Second, what the language gives, it also takes away. The records "in TAAMS" will be verified to ensure that they are "complete," but only "to the greatest extent practical." Pls.' Ex. 238, at 15. Similarly, this approach "will involve verifying the data in TAAMS" against "other" records, but plaintiffs are left with only the promise that "roughly 30% of all BIA hardcopy records will be reviewed," and that 30% will be "at least partially" reconciled to the TAAMS information. *Id.* On the other hand, the plan does include a review of "other hardcopy sources and available sources of information." *Id.*

It is clear that Interior has no intention of beginning to gather necessary third-party documentation, if at all, until the fifth phase of document cleanup (except for "vital information" and anomalies in the legacy systems). If this process is to occur at all, then it is not scheduled to begin before January 2001. *See id.* at 30 (showing that there are no Phase Five beginning or ending deadlines through December 31, 2000). Even at that point, Interior's intent to gather third-party documents is dubi-

ous, and hedged at that. Therefore, it can be fairly stated that Interior has no written plan to gather this necessary missing information required to render an accurate accounting. Indeed, it does not even have a discernable intent to do so.

### 2. BIA and OHA Probate Backlog

BIA has a probate backlog of approximately 12,000 cases. These probates affect the land interests in the IIM trust; in turn, land interests are determinative of the proper payment amounts that must be made to each affected beneficiary. Thus, the probate backlog has a direct effect on the proper administration of the IIM trust and must be eliminated. The HLIP currently contains no formal plan to deal with the probate backlog. However, a "re-invention team" has developed a plan that will be formally included in the HLIP revision. That plan has several components including: (1) hiring additional staff working on probate at the area level; (2) using skilled "SWAT" teams to go area by area to reduce the backlog; (3) asking Congress for an amendment to the authorizing statute to increase the size of the estate that can be probated administratively to avoid an automatic-hearing right in the Office of Hearings and Appeals; and (4) designing an automated tracking system. Trial Tr. at 984–85. In addition to these anticipated improvements, BIA is taking other steps to address the problem of fractionated Indian land interests in allotments.[14]

---

**14.** These fractionated interests arose out of the history of the allotments. The original allotments were generally made about one-hundred years ago, and virtually all of the original allottees died intestate, resulting in a distribution of interests in the allotment among all the decedents' children. This process has continued for nearly seven generations, resulting in numerous owners of some of these allotments. Trial Tr. at 973–76. As a result of this fractionalization, the average land allotment has forty or more owners, complicating both asset and financial trust management. The fractionated interests are further complicated by allotments leaving trust status by virtue of non-Indians ownership. Most tribes have blood quantum re-

quirements. For instance, the Pawnee Tribe of Oklahoma requires that an individual be one-quarter or more Pawnee blood in order to be a member of the tribe. If an individual Pawnee is one-quarter and his or her spouse is not Indian, then their children will be one-eighth Pawnee and therefore not members of the Pawnee Tribe. At that point, when the children inherit the allotment, the land comes out of trust because the United States only has a trust responsibility to Indians. Trial Tr. at 978–79.

Congress has twice tried to address the problem of fractionated interests, but both statutes were held to be unconstitutional. *See Babbitt v. Youpee,* 519 U.S. 234, 117 S.Ct.

### 3. BIA Appraisal Program

Appraisals are important for evaluating whether the trustee is managing the underlying assets prudently. While asset management is not part of this lawsuit, appraisal backlogs affect the processing of leases, which in turn affects the ability to render an accounting. The most recent number given to the court, which was derived by the former Special Trustee, states that there were approximately 212,000 title defects that needed to be addressed through reducing the appraisal backlog. Trial Tr. at 143–44.

Interior plans to reduce some of the appraisal backlog by re-defining when appraisals are required as a matter of Interior policy. This re-definition has lead to two fundamental appraisal changes. First, BIA has determined that a single appraisal before a lease is entered is sufficient, as opposed to appraising the property on a yearly basis. Trial Tr. at 1020–21. Second, because BIA is not required to provide appraisals on properties not held in trust, BIA has eliminated its practice of providing appraisals of properties held in fee. Trial Tr. at 1010–11; Defs.' Ex. 56; Defs.' Ex. 57. BIA has begun to implement a computer-generated modeling technique to value fractional land interests. In so doing, Interior hopes to achieve some balance between the need to value the very small interests in these allotments versus the cost of performing full-fledged appraisals on those same small interests. Trial Tr. at 1016–17.

### 4. Computer Systems

Both Secretary Babbitt and the Special Trustee agreed that the government has fallen behind in maintaining the technical capabilities necessary to track trust resources and that the upgrade of these systems had to take foremost priority. Trial Tr. at 3707–10. For this reason, Interior committed to the acquisition and implementation of the two new systems—TFAS and TAAMS. Defs.' Ex. 28; Defs.' Ex. 45.

#### a. OST Trust Fund Accounting System (TFAS)

TFAS is a commercial-off-the-shelf (COTS) trust fund financial management, as opposed to asset management, system. Plaintiffs' own expert testified that TFAS is a major improvement over the present system. Trial Tr. at 4271–72. In fact, in terms of the software and hardware itself, plaintiffs do not appear to quarrel with TFAS or its capabilities per se. Assuming that complete and correct information is retrieved and loaded onto TFAS, and further assuming that TFAS can properly integrate with the other necessary computer and business systems, then it should allow Interior to bring OTFM's financial management practices up to commercial standards. With these two assumptions made—which is a huge leap given the current state of documentation and planning—TFAS will accurately track disbursements, receipts, and securities; handle the pricing or evaluation of securities; produce accurate account statements; keep and update correct names and addresses; reconcile accounts; provide for direct deposits; provide effective internal controls, including a routine file maintenance audit trail; and enforce internal controls through the use of passwords.

727, 136 L.Ed.2d 696 (1997); *Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987). BIA carried out the escheat provision for several years before the *Youpee* decision, and a large number of interests were probated and escheated to the tribes under the Indian Land Consolidation Act. When the Supreme Court struck down that Act, Interior had to decide whether it would give *Youpee* retroactive application. As a matter of policy, after Mr. Gover joined Interior, BIA decided that it should try to re-open the probates and, where the tribe was willing, give the money previously paid to the tribes from escheated back to the rightful heirs. Trial Tr. at 981–82. However, BIA does not have the authority to force the tribes to return the money. Trial Tr. at 982. In all, there are 80,000 interests affected by *Youpee,* all of them very small. Trial Tr. at 982.

### b. *BIA Trust Asset and Accounting Management System (TAAMS)*

BIA still maintains much of its data relating to IIM trust accounts on two separate electronic database systems: LRIS, which stores information on certified title for allotted lands, and IRMS, which stores data regarding IIM trust account transactions. Some BIA offices use these systems, some use modified versions of these systems, some use their own "in-house" electronic databases, and others continue to use manual paper systems. Trial Tr. at 1490–91; 2310; 4572; Pls.' Ex. 238, at 9. Thus, the systems used in any given area or agency BIA office vary, which is one significant cause of the current trust management problem.

Admitted inadequacies of LRIS and IRMS, which are still operational and used to issue IIM trust checks, include: (1) inconsistent data, making it difficult to identify the appropriate owners of allotments or beneficiaries' appropriate land interests therein; (2) inconsistent use of the legacy systems; (3) significant backlogs in the certification of title; (4) the absence of important information, such as the schedules for payments due on leases; (5) the absence of an adequate general ledger system; (6) the nonexistence of a master list of leases and assets; and (7) insufficient internal controls and audits of the systems. Trial Tr. at 120–22; 148; 152–55; 409–13; 416–18; 420–21; 435; 441–42; 622; 1153–54. The government admits these fundamental flaws in the systems, and it admits that these systems are used to manage and disburse IIM trust funds today. However, the government has purchased a new system that is currently in the pilot stages of implementation, specifically in the Billings Area BIA office. Like TFAS, TAAMS is not yet operational or implemented and therefore is not used to issue IIM trust payments or manage IIM assets.

Like TFAS, in pure software and hardware terms, TAAMS appears to be an adequate asset management system as modified to fit BIA's needs. Also like TFAS, however, the ultimate success of TAAMS depends on complete and accurate data and a proper interface with the other trust management business and computer components. With these assumptions made, TAAMS, when implemented, will allow BIA to administer trust assets, generate timely bills, identify delinquent payments, track income from trust assets, and distribute proceeds to the appropriate account holders. The key features of TAAMS that will support these functions are a billing and accounts receivable subsystem and a collection subsystem. TAAMS also will have a major module for administering land title records, a submodule for probate tracking, and a tickler system that will notify BIA employees of upcoming important events, such as when leases are about to expire, when it is time to advertise leases, and when collections are due. Trial Tr. at 1150 & 2390. TAAMS will generate title status reports and modern title documents (such as used by title insurers). Trial Tr. at 2319. Specifically, TAAMS will pull all tracts of land owned by a single individual nationwide. Trial Tr. at 2810. Conversely, the tract mechanism in TAAMS will provide information on who actually owns the land and the legal description of the tract. In addition, TAAMS will provide all the documents associated with a tract of land or, conversely, will identify the land that a document covers.

TAAMS automatically will create a receivable and generate a receivable ledger that gives BIA the ability to track what money is due from leasing and permitting activities. Once payments are received, those accounts receivables will be credited and reconciled. After the money flows into the system, it will be put through the income distribution function for distribution back to the individual account holders. Trial Tr. at 2788–89. TAAMS will calculate interest for money collected and subsequently disbursed. Trial Tr. at 2390; 2758–59. Further, TAAMS will generate

payment coupons, which will permit the use of lockboxes. Trial Tr. at 2390. TAAMS also will generate account statements for owners showing all the owners' interest in land. Trial Tr. at 2391. TAAMS will issue reports for land holders covering all transactions related to any leases on that landowner's property. Trial Tr. at 2391. Further, TAAMS will track title and chain of title. Trial Tr. at 2391.

### 5. *OST/BIA Records Management*

As defendants admit, a coherent plan for the proper retrieval and management of trust documents is critically important to the discharge of the United States' continuing trust obligations. OST and BIA, especially, must function seamlessly with regard to document management. On February 11, 1998, Interior created a records management group to set up a framework to: (1) formalize the transfer of the financial trust records from BIA to OST; (2) prepare a mutual budget for BIA and OST for records management operations; (3) draft, for BIA and OST headquarters' approval, a memorandum of agreement between BIA and OST covering trust records

and operational matters, including joint procedures of records management; and (4) develop and submit for departmental and National Archives Records Administration (NARA) approval records control schedules. Defs.' Ex. 41; Trial Tr. at 575–76. Thus, five years after the Trust Fund Management Reform Act, the trustee has planted the seed for responsible document management.

Ken Rossman moved to Interior from the State Department and now heads the HLIP records management sub-project. Trial Tr. at 1044; 1872; 2181. Rossman's high-level records management plan was approved by the Acting Special Trustee and Assistant Secretary for Indian Affairs.[15] Trial Tr. at 1044; Defs.' Ex. 58. Rossman's plan contains several action items for records management improvements, including: (1) program management, addressing staffing and oversight responsibility for the records management program; (2) day-to-day records operations, including a process for setting the records retention period for trust related records, daily use of historical records, and

**15.** As with many positive steps taken by defendants toward bringing themselves into compliance with the law, the approval of Rossman's records management plan did not come easily. The frustration arising from departmental in-fighting is described best in Rossman's own words in an e-mail he sent to the Acting Special Trustee:

> I've grown increasingly frustrated with the negotiations over records management as a result of my recommendations. I was brought to Interior ... to provide an approach to records management from a professional's point of view. I believe I produced a thoughtful, well-integrated product that responded in large part not only to the HLIP Sub-project, but also to the Special Trustee's strategic plan and various other external critics .... Now, I find that the key recommendation—line responsibility for Indian affairs records in the hands of a competent records manager with corporate records experience—is being watered down to the point of, in my opinion, destroying the whole. Who will be accountable for and actually carry out the recommendations if everything is "joint" or "in cooperation with"? ... Face it, there is no BIA

Records Management Program. There are a few people with no plans, no agency direction, and no budget .... [D]on't compromise the basic integrity of making someone accountable for getting the job done. Pls.' Ex. 104. The opposition to which Rossman alluded was primarily coming from BIA. BIA wanted the records management post to be housed within BIA, not OST. Trial Tr. at 3023. Luckily, to resolve the months of gridlock on this important issue, the Acting Special Trustee, Tommy Thompson, went directly to the Secretary and secured the Secretary's approval for the passage of Rossman's records management plan. Trial Tr. at 3023.

While approval of Rossman's plan is a positive step, and Rossman, Thompson, and the Secretary all deserve credit for its passage, the gridlock associated with the approval serves as an example of just how difficult making positive change can be within the Interior environment, which has undoubtedly been one of the causes of defendants' inability to properly manage the IIM trust. This example also shows just how fragile the momentum is behind fundamental changes that need to be made in the IIM trust management system.

clearing the backlog of stored documents; (3) integrated training program, including classroom training and training in the form of publications and guidance; (4) management of electronic records; (5) further development of the records management coordination between OST and BIA; and (6) document production for this litigation. Trial Tr. at 1043–44; 1886–87. Under the approved high-level records management plan, BIA and OST will share a unified records management program with joint procedures on access to records. Trial Tr. at 2118. The unified records management staff will promulgate new record retention schedules for approval by the National Archives and Records Administration (NARA). Trial Tr. at 1977–85. This will allow Interior to resume the normal NARA process of moving records from local offices to Federal Records Centers, Archives, or, when appropriate, disposing of unneeded records. Resumption of the orderly NARA process is a critical step in resolving document storage problems. Trial Tr. at 1992–95.

F. *Facts Pertaining to Plaintiffs' Interference Claims*

Beyond their claims centering on the trust management systems put in place by the United States, plaintiffs have alleged that defendant Babbitt has obstructed the Special Trustee's discharge of his statutory duties under the Trust Fund Management Reform Act in two ways. First, plaintiffs contend that the Secretary failed to make budget requests sufficient to address the Special Trustee's needs. Trial Tr. at 167–68. Second, plaintiffs argue that defendant Babbitt acted contrary to law when he reorganized the OST without the approval of Congress or consultation with the Special Trustee. Although pages could be dedicated to Robert Lamb's testimony on the budget process and the context of the budgeting for OST, it suffices to note that the facts are largely undisputed on this first claim. The Indian Trust Fund Management Reform Act did not appropriate any funds for the operation of OST. Trial

Tr. at 3496. Defendant Babbitt did not request inordinate sums of money to fund OST, especially during OST's infancy. For example, Interior requested only $447,000 for OST funding in Interior's fiscal year 1996 budget, compared to the $3.5 million request that the Special Trustee had made to fund the operations necessary to produce his Strategic Plan. Even the modest funding that defendant Babbitt did request, however, was slashed by the Office of Management and Budget. The federal government during this period of time was undertaking severe budget cuts and was operating on a series of continuing resolutions rather than a budget approved by Congress. This conservative fiscal philosophy and resulting round of continuing resolutions undoubtedly had an impact on the actual funding and funding requests made for OST.

As for defendant Babbitt's re-organization of OST, the facts again are largely not in dispute. Defendant Babbitt claims to have reorganized OST to reflect its current operational structure, placing an operational deputy beneath the position of Special Trustee. Defendant Babbitt reassigned the Special Trustee's head records expert, Joe Christie, to another Senior Executive Service position within Interior. Christie's duties are now carried out by Ken Rossman, who has already been discussed. Defendant Babbitt did not discuss any of these radical changes of the Special Trustee's office with the Special Trustee. The Special Trustee resigned shortly after the Secretary told him of these changes, after the changes had already been ordered. Defendant Babbitt proclaims that he has the authority to do all of this under the applicable laws and regulations.

G. *The Department of the Treasury*

Treasury performs several key trust functions in the management of the IIM trust. Treasury's role as trustee-delegate is generally limited to holding those IIM trust funds kept by Interior on deposit at

the Treasury and investing the funds as directed by Interior. Within these contexts, plaintiffs have raised certain important issues concerning Treasury's discharge of its IIM trust duties. Plaintiffs have focused on four main claims against Treasury: the time lapse in availability of deposited funds, the loss of interest on issued checks, illegal document retrieval and retention policies, and the sweeping of money into the Unclaimed Moneys and Miscellaneous Receipts Accounts at Treasury. In a stipulation filed with the Court on July 6, 1999, Treasury committed to address some of these issues.

### 1. *Time Lapse in Availability of Deposited Funds*

Treasury makes deposited funds available to Interior for investment or disbursement on behalf of the account holders as soon as the funds are available to Treasury. Trial Tr. at 2225–26. Funds are available to Treasury when the funds are transferred to Treasury's General Account at the Federal Reserve Bank of New York. Trial Tr. at 2205 & 3396.

Treasury has designed an accelerated system for collecting and making deposits available. Trial Tr. at 2206–07. The latest that deposited funds are made available to Interior is, in the case of deposits by check, the next business day after deposit. Trial Tr. at 2225. In the case of electronic funds transfers, funds are available on the day of deposit. Trial Tr. at 2225. The extra day in the case of check deposits is needed to allow time for the collection of funds through the banking system and the transfer of those funds to Treasury's operating account at the Federal Reserve Bank of New York. Trial Tr. at 2205–06 & 2226. With regard at least to check deposits, OTFM acts to invest or disburse deposited IIM trust funds the day after the funds are deposited, or as soon as they are available to be invested or

disbursed. Trial Tr. at 1249 (explaining that investment and disbursement is an "overnight process"). The cutoff time for investment at Treasury is 3:00 p.m. Eastern time. Trial Tr. at 3351.

The common situation arises in which deposited funds become available to Interior only after 3:00 p.m. Such a situation is most likely to occur with electronic payments, which may settle late in the day after the cutoff time. *See* Trial Tr. at 2224 (noting that wire transfers can be received by the Federal Reserve Bank in New York as late as 6:30 p.m.). In this situation, the funds may be available to Interior, but as a result of Treasury's cutoff, Interior may be unable to invest them through Treasury until the next day. To address this problem, Treasury has agreed, in the July 6 stipulation, to allow Interior to invest such funds as if the funds had been invested "as of" the prior business day. Defs.' Ex. 103 ¶ 7; Trial Tr. at 3350–51. Indeed, the July 6 stipulation allows Interior to invest any available funds omitted from its overnight investment request as if they had been invested the previous business day.[16] Trial Tr. at 3351. This agreement enables OTFM "to sweep as much money into that overnight investment account as possible for that day's activities," Trial Tr. at 3351, and thereby to "maximize . . . the amount of investment that's available to OTFM." Trial Tr. at 3351.

### 2. *Loss of Interest on Issued Checks*

Plaintiffs specifically challenge the way in which Treasury treats invested funds at the time of IIM trust check issuance. The facts pertaining to this claim are relatively clear and largely undisputed. When IIM trust deposits of plaintiffs' money are made by OTFM into Treasury, Treasury keeps the funds in a Treasury General Account, which is available for the United States' daily financial needs. Although the money itself resides in that account, a

---

**16.** The July 6 stipulation applies to those funds that are "available to Treasury" on the prior business day. Defs.' Ex. 103 ¶ 7.

number of other operations take place, mainly in the forms of accounting entries and investment. The United States admits that the IIM trust funds are invested, when requested by Interior, until IIM trust checks are issued. When a check is issued to a beneficiary, the money is debited from the investment account, which earns interest, and is placed into a non-interest bearing account until the time the check is negotiated and the funds leave Treasury. Thus, between the time that a check is issued and presented for payment, plaintiffs' IIM trust money earns no interest.

During the course of the trial, Treasury agreed to conduct a study of its IIM trust check negotiation practices. Defs.' Ex. 103 ¶ 8; Trial Tr. at 3352. Specifically, Treasury has agreed to:

> undertake a study, which it anticipates completing within one year . . . to determine the average time between the date of OTFM check issuance and the date of presentation of those checks to the Federal Reserve for payment.

Defs.' Ex. 103 ¶ 8. Aside from agreeing to study the issue, which in itself does not alter the current practice, Treasury has done nothing to address this issue.

### 3. *Illegal Document Retrieval and Retention Policies*

Plaintiffs' most significant prospective claim in terms of receiving an accounting deals with IIM-related trust records retention and destruction policies. Specifically, plaintiffs challenge Treasury's policy, enacted pursuant to the destruction schedule promulgated by the National Archives and Records Administration, of destroying all documents after six years and seven months. Treasury historically has followed this policy. Trial Tr. at 142. Treasury cannot, under its current system, segregate IIM trust checks or records from any other type of record. Thus, before the

onset of this litigation (and during the litigation for some time), Treasury's documents pertaining to the funds, including canceled checks, went to the shredder despite the admission that the IIM trust is nowhere close to being reconciled.

Treasury has partially addressed these issues in the long term through its stipulation. Treasury has agreed to implement a system that will allow IIM trust checks to be retrieved by payee name, which is currently an unavailable function. With regard to the document destruction allegations, Treasury has agreed to work with Interior to propose a new, yet to be determined record retention schedule for trust documents. There is some issue, however, as to whether this new record disposition schedule would change the policy for all IIM-related trust documents or simply IIM trust account documents.[17] *See supra* II(B) (discussing the "IIM account" at Treasury as one of several accounts involved in Treasury's IIM trust-management process). In the short term, Treasury and plaintiffs have reached an agreement for the retention of IIM trust documents for the purposes of this litigation. *See* Stipulated Order of Aug. 12, 1999.

### 4. *The Sweeping of Money into the Unclaimed Moneys and Miscellaneous Receipts Accounts at Treasury*

Finally, plaintiffs make vague accusations about certain money purportedly kept in the "unclaimed moneys" or "miscellaneous receipts" accounts at Treasury. These allegations do not appear in plaintiffs' complaint and they were recently raised at the time of trial. There are only two important factual conclusions to be drawn from the record on these claims. First, plaintiffs have adduced no evidence of a systemic problem with Treasury's handling of plaintiffs' funds in a manner that involves either of these accounts. Sec-

---

**17.** Because this issue mainly involves an interpretation of the stipulation, discussion of this point will be reserved until the conclu-sions of law section of this Memorandum Opinion.

ond, plaintiffs provide no support for the contention that they are entitled to any prospective relief based upon one instance of improper handling of certain funds. It is undisputed that, at one point in the 1980s, there was one proved instance in which IIM trust money was improperly placed in an unclaimed moneys account. However, plaintiffs have adduced no other evidence beyond this admitted example. Thus, plaintiffs can point to no other evidence that would entitle them to prospective relief.

### III. *Jurisdiction and Scope of Lawsuit*

Before continuing on to conclusions of law, this court's jurisdiction must be established. Relatedly, the court is compelled to once again state the proper scope of this lawsuit in terms of proper jurisdiction and current case or controversy. Although the court has largely dealt with these issues in earlier opinions, it must do so once again by virtue of the parties' current arguments presented in their proposed findings of fact and conclusions of law.

### A. *Subject Matter Jurisdiction*

■ The court has jurisdiction over plaintiffs' statutorily based claims related to the IIM trust. *See Cobell*, 30 F.Supp.2d, at 31–33. Plaintiffs have alleged various statutory violations, and, in substance, the focus of their claims is to enforce the statutory right to an accounting. Plaintiffs state claims both within and without the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. All of plaintiffs' soundly grounded claims arise from the statutory scheme giving defendants pervasive control of plaintiffs' IIM trust money. *See United States v. Mitchell*, 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Hence, all of these claims "arise under" the laws of the United States and therefore under 28 U.S.C. § 1331, which grants the court federal question jurisdiction.

### B. *Waiver of Sovereign Immunity*

■ Because plaintiffs bring their lawsuit against federal officials, plaintiffs must prove a clear waiver of sovereign immunity that covers the substantive claims and remedies that they seek. Plaintiffs have done so. *See Cobell*, 30 F.Supp.2d at 31–33. Section 702 of the APA waives these officials' sovereign immunity for all of plaintiffs' claims that this court will consider. Section 702 states:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702. As described in the legislative history of this provision, § 702 was intended "to eliminate the defense of sovereign immunity with respect to any action in a court of the United States seeking relief other than money damages and based on the assertion of unlawful action by a Federal officer." H.R.Rep. No. 1656, 94th Cong., 2d Sess., at 2 (1976).

■ Clearly, plaintiffs' APA claims, which stem from the statutory right to an accounting, *see* 25 U.S.C. § 162a(d)(1)-(7), fall within this provision. Plaintiffs have repeatedly stated that they do not seek to recover any money or other substitutionary relief. *See Cobell*, 30 F.Supp.2d at 39–40 & n. 18. The court has so held and has construed their claims in that light. *See id.* Plaintiffs' claims arising from the statutory right to an accounting are claims for relief "other than money damages" in the purest form. Thus, they fall under the waiver of sovereign immunity in 5 U.S.C. § 702.[18]

18. Similarly, the law is clear that, to the extent a waiver is needed, § 702 waives the government's sovereign immunity for certain non-APA claims, as well. *See id.* at 31 (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C.Cir.1996); *Clark v. Library of Con-*

Despite plaintiffs' disavowal of seeking an order from this court to force defendants to pay money, and notwithstanding that plaintiffs do not seek any other form of relief that is in fact a legal substitute for receiving such payments, defendants still steadfastly contend that "there is a significant issue regarding whether sovereign immunity has been waived" as to the second phase of this lawsuit regarding the actual accounting in light of the controlling statutes. Defs.' FF/CL at 128 n.64. In full, defendants make the following argument:

> Plaintiffs must show not only that there has been some waiver of immunity, but also that the waiver extends to the particular cause of action asserted. *Cf. Lane v. Pena*, 518 U.S. 187, 197, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). Plaintiffs' claim for an accounting cannot logically be severed from their claims (temporarily shelved for purposes of this case) for monetary reimbursement for alleged breaches of trust. An equitable action whose eventual purpose is to recover money does not fall within the waiver of Section 702, even if Plaintiffs do not seek money in the instant action. *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 692, 142 L.Ed.2d 718 (1999) (equitable action for a lien was not within waiver of Section 702 as it was "merely a means to the end of satisfying a claim for the recovery of money;" thus, plaintiffs' "ultimate claim" was not one for "other than money damages" within the terms of the waiver). Even though this Court struck claims for money damages from the complaint, the close relationship between Plaintiffs' claim for an accounting

and their stated desire for money damages is clear from the original Complaint. *See* Prayer for Relief at ¶ 4 (Plaintiffs ask "for a decree ordering an accounting and directing the defendants to make whole the IIM accounts of the class members"). The common law remedy of an accounting is part and parcel of a monetary claim. See Eichengrun, *Remedying the Remedy of Accounting*, 60 INDIANA L.J. 463 (1984/1985) ("The true accounting remedy yields a restitutionary award of the defendant's profits wrongfully obtained from the use of the plaintiff's property. The plaintiff must establish some basis for the obligation to account, the defendant is ordered to account, and the plaintiff then gets an order directing payment of the sum of money found due."). For this reason, the claim for a retrospective accounting, which is the basis for Phase II trial and discovery associated therewith, must be dismissed, as Section 702 does not waive sovereign immunity, and this Court accordingly has no jurisdiction over it.

*Id.*

In short, defendants misconstrue and then conflate two important jurisdictional considerations—the Supreme Court's recent holding in *Blue Fox* and the true nature of plaintiffs' claims to enforce their statutory right to an accounting. Similarly, there is absolutely no evidence of the glue that holds defendants' two erroneous premises together—that plaintiffs have made (or will make) "claims . . . for monetary reimbursement for alleged breaches

---

gress, 750 F.2d 89, 102 (D.C.Cir.1984); *Dronenburg v. Zech*, 741 F.2d 1388, 1390 (D.C.Cir.1984); *Schnapper v. Foley*, 667 F.2d 102, 108 (D.C.Cir.1981); *Sea–Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C.Cir. 1981)). To the extent that their claims are not reviewable under the APA, then plaintiffs are entitled to non-APA, or "non-statutory," review. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). For example, plaintiffs contend that defendants do not

have legal authority to destroy certain trust-related documents. If this claim is not reviewable under the APA for some reason, then plaintiffs may state this claim outside of the APA under the applicable standard for non-statutory review. *See Chamber of Commerce*, 74 F.3d at 1328. Because the court ultimately holds today that plaintiffs' proved breaches of trust are actionable under the APA, the court will not address the merits of plaintiffs' non-statutory review allegations.

of trust," but that these claims have simply been "temporarily shelved for the purposes of this case." *Id.*

First, defendants misconstrue *Blue Fox.* In *Blue Fox,* an insolvent prime contractor failed to pay claimant Blue Fox, Inc., a subcontractor, for work that Blue Fox completed on a construction project for the Department of the Army. *Blue Fox,* 119 S.Ct. at 689. Blue Fox sued the Army directly, as opposed to suing the prime contractor, and attempted to gain an equitable lien on certain Army funds. *Id.* at 689–90. Thus, Blue Fox sought to artfully plead a money damages action as an equitable action for obtaining a lien, which would have had the same effect as a money damages claim. The equitable lien would have produced a monetary substitute as compensation for Blue Fox's injuries, suffered as a result of the prime contractor's actions.

The Court of Appeals for the Ninth Circuit held that § 702 waived the Army's sovereign immunity because Blue Fox had brought an equitable action. *Id.* at 690. The Supreme Court reversed. The Court began by re-affirming the text of § 702, stating that the government's sovereign immunity had been waived in actions seeking relief "other than money damages." *Id.* at 691; *see also* 5 U.S.C. § 702. Next, the Court held, as did this court in November 1998, that § 702's waiver does not turn on whether an action is equitable or legal in nature; rather, the proper issue is whether the claim is one for money damages (*i.e.,* a sum used as compensatory relief to substitute for a suffered loss, as opposed to a specific remedy that attempts to give the plaintiff the very thing to which he was entitled). *Blue Fox,* 119 S.Ct. at 691; *see also Cobell,* 30 F.Supp.2d at 40–41. From this point, the court analyzed

the nature of Blue Fox's claim for an equitable lien and held that it was, in effect, a claim for money damages and therefore not a claim within § 702's waiver. *Id.* at 692. The Court's ultimate rejection of Blue Fox's claim for an equitable lien turned upon its finding that the "sort of equitable lien sought" by Blue Fox constituted money damages because its goal was "to seize or attach money in the hands of the [g]overnment *as compensation* for the loss resulting from the default of the *prime contractor." Blue Fox,* 119 S.Ct. at 691 (emphasis added). In other words, the equitable lien was attempting to shift a property interest to Blue Fox that would have effectively given it the same relief as a compensatory sum, and therefore this claim fell outside § 702's waiver. *Id.* (noting that an equitable lien grants a claimant a "security interest in the property, which [the claimant] can then use to satisfy a money claim" (quoting D. DOBBS, LAW OF REMEDIES § 4.3(3), at 601 (2d ed.1993))). Moreover, Blue Fox's action was one for substitute relief, as opposed to specific relief, because it was brought against the government and not the prime contractor.

■ Contrary to defendants' argument, the Court did not hold that all *"equitable* actions whose *eventual* purpose is to *recover money* does not fall within the waiver of Section 702, even if [the claimants] do not seek money in the instant action." Defs.' FF/CL at 129 n.64 (emphasis added). As explained above, the Court specifically held that whether an action is equitable or not is not determinative of whether an action falls under § 702's waiver.[19] Moreover, the Court never held that an action falls outside of § 702's waiver if the claimant's eventual purpose is to seek "monetary redress." Rather, the equitable lien

---

19. The court is aware that its November 1998 ruling used the equitable nature of plaintiffs' action for an accounting as further proof of § 702's applicability. *See Cobell,* 30 F.Supp.2d at 41–42. As the court's ruling made clear, however, this (now erroneous) point was merely further support for the

court's § 702 analysis. *See id.* ("The line of case law stating that the remedy of accounting is an equitable one further supports the conclusion that the plaintiffs' requested relief is one for specific relief, as opposed to one for money damages.").

in *Blue Fox* was *itself* the transfer of property interest that would have been the basis for the compensatory redress; although Blue Fox may have had to bring a further claim to enforce that lien, the case before the Court involved the shifting of the determinative interest. Furthermore, as stated above, Blue Fox's claim was substitutionary in nature because it sought to recover money from the government, not the prime contractor. Finally, that money may be recovered is not determinative of whether a claim for money damages has been made. As Supreme Court precedent makes clear, it is the nature of the action and the compensation that is conclusive. *See Bowen v. Massachusetts,* 487 U.S. 879, 893–96, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). The money must be compensatory or substitutive in nature, as it was in *Blue Fox*. Plaintiffs do not, as explained below, make any type of claim for money in this case. Instead, they seek to enforce a non-compensatory statutory right to an accounting through APA and non-APA means. The Supreme Court in *Blue Fox* explicitly recognized that, even in the context of paying money, "a suit seeking to enforce [a] statutory mandate itself" falls within § 702's waiver of sovereign immunity. *Blue Fox,* 119 S.Ct. at 692 (quoting *Bowen,* 487 U.S. at 900, 108 S.Ct. 2722); *see also Rockbridge v. Lincoln,* 449 F.2d 567, 573 (9th Cir.1971) ("Appellants[, all Navajo Indians,] are not seeking money damages from the government, nor are they seeking to assert some right against it or to block a government project. The relief they seek does not in any way affect the sovereign power of the United States. The government is not asked to give up a right, to grant a concession, to dispose of property or to relinquish authority. Appellants merely seek a court order directing certain government officials to perform acts which Congress has already directed those officials to perform ...."). Thus, defendants' expansive interpretation of *Blue Fox* is fatally flawed and undermines their argument on this point.

Second, as alluded to above, defendants desperately attempt to make plaintiffs' claims something that they are not. As their general attack, defendants cite to a law review article for the proposition that the "true accounting remedy yields a restitutionary award ... and the plaintiff gets an order directing payment of the sum of money found due." Defs.' FF/CL at 128 n.64 (citing James Eichengrun, *Remedying the Remedy of Accounting,* 60 Indiana L.J. 463, 463 (1984/1985)). Whether at common law a "true" accounting claim necessarily involved an order for payment of money is irrelevant. Plaintiffs have expressly disavowed seeking an order for the payment of money in this case. Thus, accepting defendants' "true accounting" argument as correct for the moment, plaintiffs simply do not seek every element of a "true" accounting, as that phrase was meant at common law. Instead, and most importantly (as the government is fond of recognizing in other contexts) plaintiffs do not even properly seek a common-law claim for an accounting. *See infra* subpart III(C). Instead, they seek to enforce their statutory right to an accounting as that phrase is meant under the provisions of 25 U.S.C. § 162a(d)(1)-(7) and 25 U.S.C. § 4011. Although the interpretation of this statute does, as the government admits, demand that the court look to common law for guidance, it does not mean that plaintiffs must by necessity seek an order of money to be paid. To the contrary, plaintiffs narrowly seek to preclude defendants from acting contrary to law in abridging plaintiffs' rights granted by statute and to affirmatively force defendants to comply with the law as stated by Congress.

Third, as their more specific attack, defendants try to argue that plaintiffs' accounting claim is merely "part and parcel" of a hypothetical money damages claim that has been "temporary shelved for the purposes of this litigation." This argument is mistaken and is simply another variation on the premise that plaintiffs must really be seeking money damages.

There is no evidence of any money damages claim being made in some other court, much less such a claim being "temporarily shelved." Further, even if plaintiffs were to eventually bring a money damages case in the Court of Federal Claims, and assuming that they somehow relied on their accounting claim in this case to support their argument in that lawsuit, *Blue Fox* cannot be read to deprive this court of jurisdiction based on such unsubstantiated assumptions. As explained above, the *Blue Fox* claimant sought an equitable lien as its substitutionary remedy. The equitable-lien action was itself a claim for money damages in disguise because it would have given the claimant a property interest in the Army's funds. The thrust of Blue Fox's suit was compensation. In contrast, the type of accounting sought in this case (which is really just a statutory right) would not itself be substitutionary; no property interests will change hands. At most, the enforcement of this statutory right may partially support some future monetary claim (but not necessarily "money damages"), which, because this is plaintiffs' own money, will only be compensatory to the extent that the money is missing from the trust.[20] In the case at bar, plaintiffs seek "the very thing to which they are entitled," an accounting of their money that actually exists in the IIM trust. *Blue Fox*, 119 S.Ct. at 692 (quoting *Bowen*, 487 U.S. at 895, 108 S.Ct. 2722). Therefore, defendants' arguments on these jurisdictional points fail.

### C. Plaintiffs' Common–Law Claims for Breach of Trust

One significant point of confusion in this lawsuit has been the source of law giving rise to plaintiffs' valid claims. Plaintiffs continue to believe, despite this court's references to the contrary, that they state valid common-law claims against the government for breach of trust. At the motion to dismiss stage, the court was not in a posture to dismiss these claims because of different possible interpretations of plaintiffs' complaint. At the summary judgment stage, the court stated that it read plaintiffs' soundly grounded claims to be derived from statute, not the common law.[21] Now, because plaintiffs have continued to pursue rights allegedly granted to them by the common law of trusts (but apparently not statute), the court must finally address this issue. This issue has not been squarely addressed before by any court and has been the source of some discussion in academia. *See generally* John F. Duffy, *Administrative Common Law in Judicial Review*, 77 TEXAS L. REV. 113 (1998); Reid Peyton Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213 (1975). The court believes that the government has the better argument on this point. Plaintiffs cannot state common-law claims for breach of trust against these federal officials in the context of financial mismanagement of the IIM trust. "There is no such thing as a common law of judicial review in the federal courts." *Stark v. Wickard*, 321 U.S. 288, 312, 64

---

**20.** This point raises another flaw in defendants' argument. Defendants' own position is that the "true remedy" of an accounting yields a "restitutionary award." " [*R*]*estitution* is not *damages;* restitution is a restoration required to prevent unjust enrichment." D. DOBBS, LAW OF REMEDIES § 4.1(2), at 557 (emphasis in original). The Supreme Court has emphasized that "[t]here is no evidence that any legislator [involved in the passage of § 702] understood the words 'money damages' to have any meaning other than the ordinary understanding of the term as used in the common law for centuries. No one sug-

gested that the term was the functional equivalent of a broader concept such as 'monetary relief.' " *Bowen*, 487 U.S. at 897, 108 S.Ct. 2722. Thus, setting aside all of the other reasons that defendants' argument fails, defendants' own premises do not lead to the conclusion that they seek.

**21.** The court did state that, as a matter of statutory construction, the common law plays a role in the interpretation of defendants' duties. The government agrees with this position.

S.Ct. 559, 88 L.Ed. 733 (1944) (Frankfurter, J., dissenting).

On this issue, plaintiffs have taken the approach that the IIM trust is a trust and, therefore, the standard duties governing the trustee-beneficiary relationship at common law can be imported through sources such as the *Restatement (Second) of the Law of Trusts* and, presumably, the case law underlying such treatises. It is true that there is abundant case law to support the propositions that the government's conduct with relation to the Native American people must generally "be judged by the most exacting fiduciary standards," *see Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), and that "where only a relationship between the [g]overnment and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects, adequately describe the duty of the United States," *Nevada v. United States,* 463 U.S. 110, 142, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). Importantly, however, it does not follow from these principles that plaintiffs may simply claim that they are the beneficiaries of a trust relationship with the United States and therefore invoke all of the rights that a common-law trust entails. *See* Felix S. Cohen, Handbook Of Federal Indians Law 169 (1942) (noting that the full body of common-law duties and rights "does not exist between the United States and the Indians"). As the Supreme Court also stated in *Nevada,* "the [g]overnment is simply not in the position of a private litigant or a private party under traditional rules of common law or statute." *Nevada,* 463 U.S. at 141, 103 S.Ct. 2906. "The federal power over Indian lands is so different in nature and origin from that of a private trustee ... that caution is taught in using the mere label of a trust plus a reading of *Scott on Trusts* to impose liability on claims where assent is not unequivocally expressed." *Mitchell II,* 463 U.S. at 234, 103 S.Ct. 2961 (Powell, Rehnquist, and O'Connor, JJ., dissenting) (quoting

*Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265, 283 (1981) (Nichols, J., concurring in part and dissenting in part)).

Plaintiffs' actionable rights in this case stem from and are shaped by three bodies of law. In all three cases, plaintiffs' substantive rights are created by—and therefore governed by—statute. Thus, to the extent plaintiffs seek relief beyond that provided by statute, their claims must be denied. Plaintiffs' statutorily-based claims against the government can be brought under the APA. *See Rockbridge,* 449 F.2d at 573.

■ First, as a matter of litigating against the government, plaintiffs may enforce rights granted to them by statute under the provisions of the APA. Persons seeking review under the APA must show that they suffered a "legal wrong because of agency action" or that they were "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. This right to review of administrative action does not stand alone; persons seeking APA review must show some independent statutory right to which they are entitled. *See Rasmussen v. United States,* 421 F.2d 776, 779 (8th Cir.1970).

■ Second, to the extent that certain governmental actions cannot be reviewed under the APA, then plaintiffs may seek non-statutory review. *See Chamber of Commerce,* 74 F.3d at 1327. In *Chamber of Commerce,* the Court of Appeals for the District of Columbia Circuit instructed that non-statutory review stems from *American School of Magnetic Healing v. McAnnulty,* in which the Supreme Court held:

acts of all [governmental department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief .... Otherwise the individual is left to the absolutely uncontrolled and arbi-

trary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.

187 U.S. 94, 108, 23 S.Ct. 33, 47 L.Ed. 90 (1902). In construing *McAnnulty,* the Court of Appeals held that successful non-statutory review demands that the challenged conduct be ultra vires and that the governmental action violate either a specific statutory prohibition or deprive an individual of a right granted by statute. *Chamber of Commerce,* 74 F.3d at 1327. Thus, although "non-statutory" in title, non-statutory review demands the existence of a statutory right or prohibition.

Third, plaintiffs may rely upon the rights effectively given to them by the Supreme Court in *Mitchell II.* In *Mitchell II,* the claimants brought an action for money damages in the Court of Claims under the government's waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491. The Court found that the Tucker Act was indeed a waiver of sovereign immunity for certain claims. To ultimately prevail on these claims, however, the plaintiffs had to find a basis for the substantive right to recover money damages. In *Mitchell II,* the plaintiffs found that right when the Supreme Court stated that the "statutes and regulations" before it "clearly [gave] the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians [and they] thereby establish[ed] a fiduciary relationship and define[d] the contours of the United States' fiduciary responsibilities." *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961. While the Court did recognize that "all of the necessary elements of a common-law trust [were] present," *id.* at 225, 103 S.Ct. 2961, the Court later went on to re-emphasize its earlier position that it was the "statutes and regulation at issue" that "clearly establish[ed the] fiduciary obligations of the [g]overnment," *id.* at 226, 103 S.Ct. 2961. Again, as under the enforcement mechanisms of APA and non-statutory review, it is the

statutes and regulations that create and define the enforceable trust relationship.

Plaintiffs wish to rely upon *Mitchell II* for the establishment of the trust, but then they seek to ignore *Mitchell II* when it comes to the establishment of rights. *See, e.g.,* Pls.' Resp. to Defs.' FF/CL, at 2 ("The trust for individual Indians is clearly a trust within the terms of *Mitchell II.*"). This approach must be rejected. While plaintiffs correctly point out that the Trust Fund Management Reform Act should not be rigidly interpreted as would a carefully crafted "trust instrument," it is nonetheless accurate as a general matter that it is the statutes that give defendants pervasive control over plaintiffs' lands and money. It is this pervasive control that has created the trust relationship. *See id.* Although the Trust Fund Management Reform Act may not explicitly recite every trust duty owed by the government to plaintiffs, this does not mean that every common-law duty applies, either. Whatever the scope of the government's legal duties under the IIM trust, the source is statutory law. "The extent of [a trustee's] duties and powers is determined by the trust instrument and the rules of law which are applicable." RESTATEMENT (SECOND) OF TRUSTS § 201 (1959). Accordingly, even though the IIM trust is a trust, as that term is used in *Mitchell II,* plaintiffs must point to rights granted by statute if they are to be enforced against the government. There is simply no persuasive basis for doing so on a purely common-law basis.

■ In summary, it does not matter whether plaintiffs rely upon a traditional statutory analysis of their rights against the government through APA and non-statutory review or, on the other hand, whether they claim to be beneficiaries of a trust created under the terms of *Mitchell II* (which must be enforced through one of these other mechanisms in the absence of an implied right of action). In either instance, the court's review and plaintiffs' rights are derived from and determined by statute. The court recognizes that there is

some older authority (not pressed by plaintiffs), dealing primarily with trust asset management, that could be construed more broadly to be contrary to the court's holding today. *See Cramer v. United States*, 261 U.S. 219, 229, 43 S.Ct. 342, 67 L.Ed. 622 (1923) (voiding, under trust law principles, a United States land patent that conveyed Indian lands to a railway and holding that "the fact that [the Indians'] right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive"); *Manchester Band of Pomo Indians v. United States*, 363 F.Supp. 1238, 1245 (N.D.Cal.1973) (holding that the United States bears the fiduciary trust duty to make trust property productive, and relying, at least primarily, on the common law of trusts); *Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. 252, 257 (D.D.C.1972) (holding that the Secretary of the Interior breached the United States' duty of loyalty despite the absence of any applicable treaty or statutory provision). Nonetheless, the court is compelled to follow the more current holdings of the Supreme Court, especially *Mitchell II*'s instruction that "statutes and regulations establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Mitchell II*, 463 U.S. at 224. Consequently, to the extent that plaintiffs seek relief solely alleged to be afforded to them by rights arising under the common law of trusts, plaintiffs have failed to state a claim. The times at which this court may legitimately create federal common law are both "few and restricted." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 308, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947)). While this court must consider the common law when interpreting the statutes creating and governing the IIM trust, *see NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981) (citing *Perrin v. United States*, 444 U.S. 37, 42–43, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)), a statute or regulation must nonetheless authorize this importation of common law authority. *See* Duffy, *Administrative Common Law in Judicial Review, supra*, at 116 (quoting Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 HARV. L. REV. 883, 887 (1986)). This statutorily-based perspective is the proper avenue for common-law analysis in this case. *See infra* Parts IV–VI. An adjudication of rights arising purely from federal common law should be eschewed because, as the Supreme Court unanimously has stated, the "function of weighing and appraising [policy considerations required by pure common-law analysis] 'is more appropriately for those who write the laws, rather than for those who interpret them.'" *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 89, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 98 n. 41, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)). For these reasons, the court will dismiss plaintiffs' pure common-law claims.

### D. *Scope of Lawsuit*

The balance of the court's task today involves only plaintiffs' requests for prospective relief with regard to their rights arising from the IIM trust and related statutes. The interplay between the two components of this bifurcated case is an important issue, however, and worthy of brief discussion. Everyone understands that the second phase of this case will involve a trial regarding defendants' rendition of an accounting. In general terms, that process will involve the government bringing forward its proof on IIM trust balances and then plaintiffs making exceptions to that proof. The government mistakenly assumes, however, that because "trial two" involves the actual accounting then the scope of the required accounting—even at the most basic level—is a matter that need not be addressed today. *See* Defs.' FF/CL at 1 n.1. On this point, the government is incorrect. *See infra* section V(B)(1) & n.31. The government

alludes to the argument that the Trust Fund Management Reform Act does not require a "historical" accounting. This argument necessarily brings the issue of whether the Act requires an accounting of all IIM trust money within the scope of today's decision. Simply put, the court cannot declare defendants' duties and assess whether defendants are in compliance with these duties without establishing the funds to which the duties apply. *See infra* section V(B)(1) & n.31. The disposition of this narrow (but threshold) issue leaves all other accounting issues as matters for the second component of this litigation, consistent with the government's position.[22] With the boundaries of the two components clarified, the court will turn its attention to plaintiffs' requests for prospective relief.

In *Mitchell II,* the Supreme Court alluded to the availability of prospective remedies in Indian trust fund cases, and the government apparently did not take issue with the availability of such prospective remedies in that case:

> Absent a retrospective damages remedy, there would be little to deter federal officials from violating [plaintiffs'] trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust.... The [g]overnment contends that violations of duties imposed by the various statutes may be cured by actions for declaratory, injunctive or mandamus relief against the Secretary, although it concedes that sovereign immunity might have barred such suits before [the passage of 5 U.S.C. § 702].

*Mitchell II,* 463 U.S. at 227, 103 S.Ct. 2961. The court recognizes that there are certain important distinctions between the case at bar and *Mitchell II.* For example, *Mitchell II* was a money damages case

brought in the Court of Claims under the waiver of sovereign immunity provided by the Tucker Act, 28 U.S.C. § 1491. The instant suit is the non-monetary analog of *Mitchell II* in the financial mismanagement context; it is an "other than money damages" action brought under APA and non-statutory review in federal district court under the waiver of sovereign immunity provided by 5 U.S.C. § 702. Nonetheless, it can hardly be said that the Court of Claims has broader prospective powers than this court. To the contrary, the Court of Claims' jurisdiction is almost exclusively concerned with damages awards, *see id.,* 463 U.S. at 216 & n. 15, 103 S.Ct. 2961, whereas this court has equitable powers stemming from its inherent powers, as verified or augmented by statutory authorities such the APA, *see* 5 U.S.C. §§ 702 & 706, and the All Writs Act, 28 U.S.C. § 1651. Thus, the Supreme Court's allusion to the *Mitchell II* plaintiffs' rights to prospective relief under the IIM trust may have been a direct reference to what is now the case before this court today.

As described in various places above, plaintiffs allege several claims that will not be considered. For the purpose of clarity, a comprehensive list of these claims will be discussed here. First, and most obviously, plaintiffs' claim for an actual accounting is a matter left for the second phase of this bifurcated case. *See supra.* Second, for the reasons given above, the court will dismiss plaintiffs' pure common-law causes of action for breach of trust. *See supra* III(C). Although many of these same duties may arise, as the government admits, as concomitants to the government's statutorily enumerated trust duties, the common-law nature of those actions can not be considered actionable in them-

---

**22.** For example, significant legal issues that remain matters for the second phase of this case include: (1) whether an applicable statute of limitations, if any, precludes any of plaintiffs' claims for an accounting; (2) whether an accounting accomplished through a sampling technique will satisfy the requirements of the Trust Fund Management Reform Act; and (3) the precise scope of plaintiffs' certified class.

selves.[23] Third, as explained below, the court will not comprehensively address issues that the government concedes and that, therefore, are not in dispute. *See infra* Part IV. Specifically, defendants do not dispute that: (1) The IIM trust is a trust. Defs.' Resp. to Pls.' FF/CL, at 4.(2) Congress has conferred primary responsibility for management of the IIM trust on the Secretary of the Interior. *Id.* at 4–5.(3) Defendants owe plaintiffs the duties that Congress has mandated. *See id.* at 10; *see also infra* Parts IV–VI (interpreting certain aspects of these statutory duties). (4) These statutorily based duties must be interpreted in light of the common law of trusts and the United States' Indian policy. *See* Defs.' Resp. to Pls.' FF/CL, at 8 n.5. (5) Proper record keeping and appropriate practices and procedures are important components of proper trust management. Defendant DOI's Factual Stipulations, filed June 11, 1999, at 2 n.2. All of these positions significantly narrow the disputed issues.

In addition to these more legally based admissions, Interior has made significant concessions on some factual matters, as well. In a written stipulation filed on the eve of trial, Interior admitted that, as of the commencement of trial:

1. [T]he Department of the Interior cannot provide all account holders with a quarterly report which provides the source of funds, and the gains and losses. [*See* 25 U.S.C. § 4011.]

2. [T]he Department of the Interior does not adequately control the receipts and disbursements of all IIM account holders. [*See id.* § 162a(d)(2).]

3. [T]he Department of the Interior's periodic reconciliations are insufficient to assure the accuracy of all accounts. [*See id.* § 162a(d)(3).]

4. [A]lthough the Department of the Interior makes available to all IIM account holders the daily balance of their account and can provide periodic statements of the account balances, the Department does not provide all account holders periodic statements of their account performance. [*See id.* § 162a(d)(5).]

5. [The] Department of the Interior does not have written policies and procedures for all trust fund management and accounting functions. [*See id.* § 162a(d)(6).]

6. [T]he Department of the Interior does not provide adequate staffing, supervision and training for all aspects of trust fund management and accounting. [*See id.* § 162a(d)(7).]

7. [The Department of the Interior's] record keeping system [is inadequate]. [*See id.* § 162a(d)(1), (3), (4), (6).]

Def. DOI's Factual Stipulations, filed June 11, 1999, at 5–6, 2 n.2.

More generously, Secretary Babbitt admitted in his testimony that:

1. He is "aware that there are many individual Indians who have not and cannot at this time get an accurate accounting." Trial Tr. at 3762; *see also* 25 U.S.C. § 162a(d)(1)-(7).

2. As of trial, "the entitlements of Individual Indians that are dictated by the trust responsibilities of the United States are not being fulfilled." Trial Tr. at 3765.

3. "The fiduciary obligation of the United States government is not being fulfilled." Trial Tr. at 3768.

4. "A major portion of that responsibility rests with [the] Secretary of the Interior." Trial Tr. at 3768.

---

**23.** In addition to denying the importation of various trust duties not relevant to obtaining an accounting of existing trust money, this ruling also disposes of plaintiffs' common-law claim that the government has breached its duty of care by divesting IIM trust funds at the time of check issuance, as opposed to negotiation. *See supra* subpart II(B) & section II(G)(2). Plaintiffs have only stated this claim on common-law grounds. *See* Pls.' FF/CL, at 40.

Like Interior, Treasury has filed a written stipulation of its own. Plaintiffs ask this court to order Treasury to take certain actions in its role as a trustee of IIM trust funds. However, because Treasury has agreed in this stipulation to take some of these actions without court order, some of plaintiffs' claims are now moot. Specifically, Treasury has agreed to take the following actions, upon which this court bases its decision today:

*RECORDS RETRIEVAL: DEVELOPMENT OF NEW SYSTEMS*

1. Treasury's current system does not allow Treasury to search and retrieve IIM checks drawn on the Treasury from individual payees without predicate information ([*i.e.,*] check symbol, serial number) from Interior.

2. *New System for Negotiated Checks*—Within one year of the filing of this stipulation, Treasury will install a new system to retrieve by payee name (and potentially an additional unique identifier such as an alpha-numeric designation from Interior) information from IIM checks negotiated after the new system becomes operational.

3. *New System for Checks Issued, but not Negotiated*—Provided that [OTFM] provides payee names and potentially an additional unique identifier to Treasury (as it presently provides other information on disbursed checks), Treasury will install, within one year of the filing of this stipulation, a new system to retrieve by payee name (and potentially an additional unique identifier such as an alphanumeric designation from Interior) information from IIM checks issued by OTFM after the new system becomes operational. This system will provide information on checks that have been issued but not negotiated.

## *RECORD RETENTION*

4. Treasury will consult with the Department of the Interior to identify IIM-related documents maintained or created by Treasury necessary to meet the government's trust obligations.

5. Following consultation with Interior, Treasury will evaluate and submit its proposed revised record retention schedules for IIM-related documents to the Archivist of the United States .... The revised schedules will address the existing undifferentiated check records as well as differentiated records once IIM check information is segregated.

6. Until the new retention schedules are in effect, Treasury will preserve:

 a. original checks, and digitized and microfilm copies of negotiated checks;

 b. check information from these same checks in electronic form ([*i.e.,*] check serial number, date and amount);

 c. monthly reports of canceled checks (either in electronic form or hard copy as retained in the normal course of business); and,

 d. IIM deposit fund investment records (either in electronic form or hard copy as retained in the normal course of business), specifically requests for investment/redemption, transaction confirmations, and monthly account statements.

## *AVAILABILITY OF DEPOSITS FOR INVESTMENT*

7. Although current OTFM practices with respect to timing of investment conform to industry standards, Treasury will nevertheless, within fifteen (15) days of the filing of this stipulation, allow OTFM, on the morning of the next business day, to invest "as of" the prior business day, all deposits that were available to Treasury the prior business day but were not included in that day's OTFM overnight investment request.

Stipulation of the Department of the Treasury, filed July 6, 1999, at 1–3.

Treasury's admissions moot much of the relief that plaintiffs seek. First, Treasury's admissions moot plaintiffs' concerns regarding the "front-end float," which is

the phrase that has been used to describe the delay in availability of plaintiffs' IIM trust funds between the time that OTFM receives the money and the time the money is made available to Treasury. *See supra* section II(G)(1). Plaintiffs' claim against Treasury was based on the fact that certain OTFM funds received after the daily cut-off would lose interest on overnight investments. As seen above, Treasury now has agreed to allow OTFM to invest "as of" the prior business day. Thus, the issue is resolved. Second, Treasury's stipulation also dramatically reduces the number of disputed issues as to the retention of certain relevant documents necessary for the United States to discharge its duty to render an accounting. *See supra* subpart II(G). Although Treasury's document destruction practices will ultimately conform to the applicable record retention schedule that is to be proposed to the Archivist of the United States (which must itself conform with the law controlling Treasury's duties as declared by this court today), until then the only category of IIM-related trust documents that Treasury has not expressly agreed to hold would be those that: (1) are not IIM trust checks, IIM trust check information, or monthly reports of canceled checks and (2) not IIM trust account investment records. So, there is still the potential that non-check, non-IIM account records may not be protected. However, given the scope of Treasury's duties, these protections resolve a large majority of immediate document retention issues. Third, Treasury's stipulation also moots plaintiffs' concerns regarding the non-segregability of IIM trust checks. For negotiated checks, Treasury will be able to segregate IIM trust checks by payee name. For issued (by OTFM) but non-negotiated checks, Treasury will also be able to segregate

IIM trust checks by payee name, assuming that OTFM gives them that information.

Interior's and Treasury's concessions, in combination with the court's dismissal of plaintiffs' pure common-law claims, significantly narrow the landscape of disputed issues in this lawsuit. These disputed issues for this phase of the trial thus have been reduced to the following:

1. Plaintiffs' declaratory judgment action, including the proper interpretation of plaintiffs' statutorily based rights with regard to an IIM trust accounting, whether defendants are currently in violation of these rights, and the appropriate remedy for such violations, if any.

2. Plaintiffs' claims of "obstruction" of the Special Trustee made against defendant Babbitt, which encompasses the budget request and reorganization of OST actions.

3. Whether this court should place the IIM trust into receivership or otherwise play a continuing role with regard to the oversight of defendants' discharge of their statutorily based IIM trust duties.

Accordingly, the court will address some final jurisdictional issues and then turn to the merits of these claims.

### E. APA "Jurisdiction"[24]

■■■■ The court has already addressed defendants' jurisdictional APA arguments once before in this lawsuit. *See Cobell,* 30 F.Supp.2d at 30–35. Defendants now raise new arguments regarding the "final agency action" component of general APA review. Although these arguments appear to be contrary to statements made by predecessor government counsel at the motion to dismiss stage, they must nonetheless be addressed once again in light of this court's duty to re-assess its jurisdiction when reasonably questioned. Finality of agency action is generally a jurisdiction-

---

**24.** The court recognizes that the APA itself does not provide an independent basis for jurisdiction. *See Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). However, given the nature of plain-tiffs' claims, the court's ultimate jurisdictional analysis must be viewed in light of the APA's various requirements. *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 77 (D.C.Cir.1984).

al prerequisite under the APA. *DRG Funding Corp. v. Secretary of Housing and Urban Dev.*, 76 F.3d 1212, 1214 (D.C.Cir.1996).

The government now contends that the HLIP is not final agency action because of the ongoing revisions of the document. Because the HLIP is (and always will be) a work in progress and, in defendants' view, is simply the implementation plan stemming from defendant Babbitt's decision in August 1997 to move forward with certain trust reforms proposed by the Special Trustee and to "defer" other measures, the implementation plan therefore relates back to the Secretary's final decision and should not itself be considered final for the purposes of judicial review. *See supra* subpart II(D); Defs.' Ex. 28.

This argument, geared solely toward the HLIP, need not be squarely addressed because it ignores one half of the court's previous jurisdictional ruling. In the November 1998 decision, the court identified two bases of final agency action. First, upon which the government today seizes, the court held that the HLIP constitutes final agency action. *See Cobell*, 30 F.Supp.2d at 33. This result was reached as the result of a concession made by predecessor government counsel. *See id.* However, the court also held that "the accounting system that the government has enacted and continues to use in the administration of the IIM trust provides this Court with reviewable final agency action for the purposes of 5 U.S.C. § 704." *Id.* The court believes that this second holding was clear and correct. In November 1998, the time of the earlier jurisdictional ruling, the enacted and continually used, current system employed to render an accounting was what is today described as the "legacy" system. To the extent that this name implies that the legacy system has been shelved, the label is a misnomer.

The legacy system, with all of its admitted flaws, is the system used today to collect funds, issue checks, and otherwise administer the IIM trust. Any new plans that the government has for trust reform will not replace the "legacy" system until some date years into the future. Government counsel simply misunderstands the court's earlier holding on this point to have been that TFAS or TAAMS were final agency action. Trial Tr. at 5037 (Government counsel: "And I don't know, but I took that as TAAMS and TFAS. Maybe it was just one or the other."). It meant neither. To the court's knowledge, no IIM trust beneficiary has ever been issued a check resulting from processes performed by TAAMS, TFAS, or the business system implemented under those computer systems' regime. *See Cobell*, 30 F.Supp.2d at 34 ("The agency's [current] accounting system has been and continues to be implemented, and the plaintiffs have no choice but to have their accounts administered under it. Thus, the accounting system that has been chosen and used by the defendants to administer the plaintiffs' IIM trust accounts cannot be said to be tentative or interlocutory in nature." (footnote omitted)).[25]

Although this holding has not been directly challenged, the court reinforces that, in certain respects, it is the effect of the government's current "legacy" system that aggrieves plaintiffs today. As explained in detail below, defendants have specific intermediate statutory duties, short of but necessarily leading up to the ultimate duty to render an accurate accounting, pursuant to 25 U.S.C. § 162a(d)(1)-(7) and other Trust Fund Management Reform Act provisions. These specific duties create rights in favor of plaintiffs. While it is true that a reasonable time must be allowed for defendants to bring themselves into com-

---

**25.** The court does not mean to imply that government counsel has intentionally misconstrued the court's previous ruling. To be fair, it should be remembered that government counsel representing defendants at the time of the earlier motions hearing and opinion issuance has been replaced by current counsel. Current counsel's mistake may have been the product of that transition.

pliance with Congress's specific mandates, as discussed below, this reasonable deadline is now past-due in certain key respects with regard to certain statutory provisions.[26] To enforce these rights, plaintiffs must attack the final agency action that is causing their harm. *See* 5 U.S.C. § 702 ("A person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . is entitled to judicial review thereof."). Plaintiffs' harm is being caused, at least in part, by the system that was in place in November 1998 and continues to be in place today, the so-called "legacy" system. While defendants are busy implementing the HLIP at their own speed, plaintiffs' rights are effectively unaddressed by the trustee. The system currently in place, as opposed to the one that may be put in place after the years of implementation of the Secretary's decisions, seems to be the much more logical final agency action carrying legal consequences today. Indeed, each day the specific statutory rights addressed below go unaddressed, the more difficult it will be for plaintiffs to receive an accurate accounting. The courts have been instructed to make the finality of agency action determination in a "pragmatic way," with an eye toward whether the agency action is definitive and has "direct and immediate" adverse impact on the challenger of the action. *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) v. National Mediation Bd.*, 670 F.2d 665, 668 (7th Cir.1981). In practical terms, there can be no greater finality as to Interior's definite current practice of issuing IIM trust money and the direct and immediate impact that action has on plaintiffs' alleged statutory rights.

 Additionally, plaintiffs have correctly alleged that, to the extent no final agency action exists, they state claims for "agency action unlawfully with-

held or unreasonably denied." 5 U.S.C. § 706(1). While the merits of this claim will be addressed below (because it involves an interpretation of the Trust Fund Management Reform Act), for jurisdictional purposes it suffices to note that courts have the duty to ensure that agency action is not unlawfully withheld or unreasonably denied. *See Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187–91 (10th Cir.1999); *Sierra Club v. Thomas*, 828 F.2d 783 (D.C.Cir.1987); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275 (D.C.Cir.1981). To the extent that defendants are correct regarding final agency action, which they are not, the Court of Appeals for the District of Columbia Circuit has recognized that "[c]laims of unreasonable agency delay clearly fall into that narrow class of interlocutory appeals from agency action over which [courts] should exercise [their] jurisdiction." *Telecommunications Research & Action Ctr.*, 750 F.2d at 79. Therefore, as to the APA claims addressed below, this court has proper jurisdiction to consider plaintiffs' claims of unreasonable agency inaction or delay.

### F. *Administrative Record*

 Despite the filing of two rounds of dispositive motions, neither the court nor plaintiffs were afforded the opportunity to review defendants' administrative record until the eve of trial in this case. Still, the focal point of this court's APA review "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Given the novelty of the issues in this government trust case, the complexity of the decisions to be made, and the late filing of a voluminous (thirty-four volume) administrative record, the government concedes that the court should rely upon both "the adminis-

---

**26.** Because the second phase of this lawsuit involves the actual accounting, the court need not (and cannot) address whether and to what

extent defendants have breached their ultimate duty to render an accounting.

trative record submitted by defendants and the testimony which explains the administrative record.'" *See* Defs.' FF/CL at 133 (citing *National Treasury Union v. Hove*, 840 F.Supp. 165, 168 (D.D.C.1994)). Extrinsic evidence is appropriate for consideration when the "processes utilized and factors considered by the decisionmaker require further explanation for effective review," which the government rightly concedes. *Sokaogon Chippewa Community v. Babbitt*, 929 F.Supp. 1165, 1172 (W.D.Wis.1996) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Public Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir.1982)). Accordingly, the scope of the court's review will proceed on the administrative record and the appropriate extrinsic evidence in the record.

## IV. *Declaratory Judgment—Basic Principles*

Consistent with their underlying theory of this case as an equitable common-law action for breach of trust, plaintiffs ask for a declaration of all trust duties arising from the IIM trust. *See, e.g.*, GEORGE T. BOGERT, TRUSTS § 153 (6th ed. 1987) ("[A] beneficiary may bring a suit in equity to secure the advice of the court as to the meaning of the trust instrument or as to questions of law affecting the trust administration."). The court has already held that plaintiffs' purely common-law claims must be disregarded because all of plaintiffs' trust rights are grounded in statute and therefore must be analyzed accordingly. *See supra* subpart III(C).

Despite this rejection of their common-law theory, however, plaintiffs can be afforded much of the same relief under the Declaratory Judgment Act, 28 U.S.C. § 2201,[27] and the APA, 5 U.S.C. §§ 703 [28] & 706.[29] The government impliedly agrees that an interpretation of plaintiffs' IIM trust duties is necessary to determine whether defendants have breached any of these trust duties,[30] and it explicitly agrees that, assuming some breach, declaratory relief would be an acceptable form of remedy.

---

**27.** The Declaratory Judgment Act provides:
In a case of actual controversy within its jurisdiction ... any court of the United States[,] upon the filing an appropriate pleading, may declare the rights and the other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2201.

**28.** 5 U.S.C. § 703 ("The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments ....").

**29.** 5 U.S.C. § 706 ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.").

**30.** Defendants' theory is that they are not in breach of any statutory duties, given their own interpretation of the Trust Fund Management Reform Act. The court cannot evaluate whether defendants are in compliance with their statutory trust duties—primarily the duties to take certain steps necessary to render an accurate accounting—without declaring in some basic sense what the ultimate accounting must entail. The court cannot determine, for example, whether defendants have "[e]stablish[ed] consistent, written policies and procedures for trust fund management and accounting," *see* 25 U.S.C. § 162a(d)(6), but not state what the goal of the written policies and procedures must be, which necessarily involves a determination of the type of accounting that must be rendered. Accordingly, the court believes that it must interpret and declare the basic nature of the accounting required by the Trust Fund Management Reform Act, as it is necessary to reach a decision in this case. *See* 5 U.S.C. § 706; *see also infra* section V(B)(1) (declaring that the Indian Trust Fund Management Reform Act requires an accurate accounting of all IIM trust money held in trust for the benefit of plaintiffs).

When a court must review an agency's construction of a statute that the agency administers, the standard of review is governed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Supreme Court announced the two-step process of reviewing an agency's interpretation of law:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. 2778. While it is not clear whether Interior has taken any clear position on its duties (aside from its counsel's legal arguments), these *Chevron* principles will guide the court in its review of the statutory mandates of Congress and defendants' carrying out of these mandates.[31] The court assumes that the position of counsel is the same as the position of the agencies that counsel represent.

 By passing the Declaratory Judgment Act, "Congress sought to place a remedial arrow in the district court's quiver." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The decision of whether to issue a declaratory judgment on any given legal issue is within a district court's "sound exercise of its discretion." *Id.* Given the statutory (and Article III) limitation of the adjudication of issues of "actual controversy," the court will carefully circumscribe its declaratory analysis today. The court will not issue a declaratory judgment as to the statutory trust duties already explicitly provided for by the statutes and admitted to by the government; these are not matters of actual controversy. Similarly, and contrary to plaintiffs' common-law approach, the court will not declare every right that arises from the statutory scheme creating the trust. Given the unique statutory nature of the IIM trust and the pertinent language of the APA, the court feels that as an equitable matter it should only declare rights "[t]o the extent necessary to decision." 5 U.S.C. § 706(1).

The court's declaratory judgment rests upon the meaning of certain specific provisions of the Indian Trust Fund Management Reform Act. The government admits that it must comply with Congress's mandates concerning the management of the IIM trust. Congress has required that, with regard to financial management of the IIM trust, defendants must:

1. Account for the daily and annual balance of all funds held in trust by the United States for the benefit of individual Indians.

2. Provide a periodic statement of performance at the end of each calendar quarter that identifies:

(a) the source, type and status of the funds;

(b) the beginning balance;

(c) the gains and losses;

(d) the receipts and disbursements; and

(e) the ending balance.

449 F.2d at 571 (citing *Squire v. Capoeman,* 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956)). While the court recognizes this principle, it does not afford it great weight in the case at bar given the clarity of the pertinent statutory provisions at issue.

---

**31.** It has been stated that "statutes passed for the benefit of dependent" Indians, such as the statutes involved in this case, "are to be liberally construed in favor of the Indians, and any doubt as to the proper construction is to be resolved in the latter's favor." *Rockbridge,*

3. Perform an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an individual Indian.

4. Provide adequate systems for accounting for and reporting trust fund balances.

5. Provide adequate controls over receipts and disbursements.

6. Provide periodic, timely reconciliations to assure the accuracy of accounts.

7. Determine accurate cash balances.

8. Prepare and supply account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.

9. Establish consistent, written policies and procedures for trust fund management and accounting.

10. Provide adequate staffing, supervision, and training for trust fund management and accounting.

25 U.S.C. § 4011(a)-(c); *Id.* § 162a(d)(1)-(7). The current issues are what, in terms of plaintiffs' prospective claims, these provisions require, whether defendants are currently in breach of any of these duties, and, if so, to what extent defendants have a plan to bring themselves into compliance in order to obviate the need for prospective relief.

## V. Declaratory Judgment—The Secretary of the Interior

### A. Overview

Plaintiffs have proved four statutory breaches of IIM trust duties by the Secretary of the Interior that warrant prospective relief. All four of these violations arise from Interior's failure to establish "consistent, written policies and procedures for trust fund management and accounting," contrary to specific statutory

duty. *Id.* § 162a(d)(6). Specifically, Interior currently: (1) has no written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust; (2) has no written policies and procedures for the retention of IIM-related trust documents necessary to render an accurate accounting; (3) has no written policies and procedures for computer and business systems architecture; and (4) has no written policies and procedures for the staffing of trust management functions. All four of these items are required to render an accurate accounting, as mandated by Congress. All four of these provisions are trust duties declared today under the Trust Fund Management Reform Act. Interior has had more than reasonable time to create these plans. Interior's agency actions of administering the IIM trust under its current system and its unreasonable delay in providing for these written plans are arbitrary, capricious, contrary to law, in excess of statutory limitation, and short of statutory right. 5 U.S.C. § 706. Accordingly, the court declares these rights and further declares that defendants are in breach of these statutory IIM trust duties.

### B. Declaration of Trust Duties Arising from the Indian Trust Fund Management Reform Act

### 1. The Secretary of the Interior's Duty to Perform Accounting on All IIM Trust Money

The threshold issue raised by Interior is whether the Trust Fund Management Reform Act imposes on the United States and, *a fortiori*, its trustee-delegates, the duty to render a "historical" accounting.[32] In other words, the issue is whether the command that "[t]he Secretary [of the In-

---

**32.** It should be noted that the court is not ruling upon what specific form of accounting, if any, the Trust Fund Management Reform Act requires. For example, the court does not purport to rule on whether an accounting accomplished through statistical sampling would satisfy defendants' statutory duties. Moreover, the court will not now address other arguments that the government may make in the future on the "historical" nature of the accounting (*e.g.*, statute-of-limitations arguments).

terior] shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of . . . an individual Indian," *see* 25 U.S.C. § 4011, really means "all funds." Defendants apparently claim that the phrase "all funds" means something less than all funds. Defs.' FF/CL, at 1 n.1. Plaintiffs claim that the Trust Fund Management Reform Act creates the duty to render an accurate accounting of all IIM trust fund money held by defendants in trust for individual Indians, without regard to the age of the funds.

 The analysis on this point is necessarily brief because the first prong of the *Chevron* analysis—whether Congress has "directly spoken to the precise question at issue"—resolves in favor of plaintiffs. In 25 U.S.C. § 4011, Congress specifically provided, under the caption "Responsibility of Secretary to account for the daily and annual balances of Indian trust funds," that the "Secretary *shall account* for the daily and annual balance of *all funds ·held in trust* by the United States for the benefit of . . . an individual Indian pursuant to the Act of June 24, 1938 (25 U.S.C. 162a)." *Id.* (emphasis added). It is clear that "shall" places a mandatory duty on the Secretary of the Interior to take the enumerated action. Shall means shall. *See Forest Guardians,* 174 F.3d at 1187. "[W]hen a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." *Id.* (citing *United States v. Monsanto,* 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989)). It is also clear that the individual Indians referenced are the beneficiaries of the IIM trust and that all IIM funds are deposited in the IIM trust pursuant to 25 U.S.C. § 162a. The only issue is whether "all funds" meant, as defendants urge, some subset of funds held in the IIM trust. Judging from the plain language of the text, as *Chevron* and all basic principles of statutory construction demand, the court can see no basis for inferring any such

limitation. To the contrary, Congress directed that the Secretary of the Interior account for all funds. The court cannot put a finer point on it than that. Defendants' position ignores the very reason that Congress was forced to pass the Trust Fund Management Reform Act, as opposed to simply issuing more informal orders—defendants' inability to render an accounting of plaintiffs' money held in trust for the past century. *See, e.g., Misplaced Trust,* Pls.' Ex. 1, at 21 (Congressman Synar, primary author of the report: "I'm going to tell you, speaking on behalf of myself and [Congressman] Yates and four Congresses, it is our clear intention— and let the Record show—it is our clear intention that these [Indian trust] accounts will be reconciled and audited before there is any movement or transfer [of the funds]. If you interpret that any other way, or if your lawyers or your personnel do, you're interpreting it wrong.").

2. *The Secretary of the Interior's Duty to Establish Written Plans for Gathering of Missing Information; Document Retention; Business and Computer Systems Architecture; and Staffing of Trust Management Functions*

(i.) *Introduction*

The Trust Fund Management Reform Act did not spell out in painstaking detail each step that Interior was required to take in order to render an accurate accounting. Importantly, however, Congress did not simply place the duty of an accounting on Interior and leave it at that, either. Instead, a middle ground was chosen.

This middle ground was necessitated by Interior's history of mismanagement of the IIM trust. By the "mid–1980s there was uniform concern about and disapproval of the manner in which Interior was handling the IIM accounts." Defs.' FF/CL, at 23. The source of Congress's frustration was Interior's historic inability to render an

accurate accounting of the Indian trust money, including the IIM trust:

> During the subcommittee's four oversight hearings on this subject, subcommittee members expressed serious concern over [BIA's] inexcusable slowness in resolving the persistent management deficiencies that have plagued the trust fund program. Now, over 2 years after the subcommittee's first oversight hearing, our continuing review suggests that only marginal progress has been made by the Bureau of Indian Affairs in recognizing and correcting these problems.
>
> The committee is particularly troubled by BIA's efforts—undertaken only grudgingly—to implement repeated congressional directives designed to provide a full and accurate accounting of the individual and tribal account funds.

*See Misplaced Trust,* Pls.' Ex. 1, at 2.

■ Consistent with its recognition of Interior's historic recalcitrance to Congress's more informal general requests, *see Misplaced Trust,* Pls.' Ex. 1, at 15–27, Congress codified certain actions that would need to be taken for Interior to reach the ultimate goal of rendering an accurate accounting. One specific mandate in this road map required the Secretary of Interior to "[e]stablish[ ] consistent, written policies and procedures for trust fund management and accounting." 25 U.S.C. § 162a(d)(6). To determine which "consistent, written policies and procedures" that Congress demanded that Interior "establish," one must determine which sets of policies and procedures are required to reach the goal of the rendition of an accurate accounting. *See id.* § 162a(d)(1), (6), (7); *id.* § 4011. The court holds that the "consistent, written policies and procedures" requirement mandates that Interior provide written plans of those functions that are necessary to lead to the rendition of an accurate accounting.

Interior's four statutory planning duties declared below arise from this principle, are consistent with the common law of trusts, and take account of the context in which the Trust Fund Management Reform Act was passed.

(ii.) *Document Retrieval and Retention*

As the Supreme Court has established, "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Amax Coal Co.,* 453 U.S. at 329, 101 S.Ct. 2789 (citing *Perrin v. United States,* 444 U.S. 37, 42–43, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). Courts must "infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." *Id.* at 330, 101 S.Ct. 2789. At common law, the trustee was "under a duty to furnish to the beneficiary on demand all information regarding the trust and its execution which may be useful to the beneficiary in protecting his rights." George T. Bogert, Trusts § 141 (6th ed.1987). This common-law duty was tied to a beneficiary's remedy should information not be rendered—an action for an accounting, which is statutorily provided in this case. *See id.* § 142.

Consistent with this amalgam of common-law principle, Interior's requirement to render an accurate accounting, and Interior's duty to establish "consistent, written policies and procedures" necessary to further the rendition of an accounting, the court declares that Interior is under the duty to retrieve and retain all information regarding the IIM trust that is necessary to render an accurate accounting of all IIM trust funds held in trust by the United States.[33] This requirement, when com-

---

**33.** The government appears to agree with this basic principle (without the caveat that it is required of "all funds"). Defs.' Resp. to Pls.'

FF/CL, at 11 ("[D]efendants have an obligation to furnish 'complete and accurate in-

bined with Congress's planning mandate, breaks down further into two separate trust duties. First, Interior must establish a written plan to retrieve missing documents necessary to render an accurate accounting. Second, Interior must establish a written plan to retain IIM-related trust documents necessary to render an accurate accounting.

The missing-data problem is undoubtedly the single biggest obstacle that Interior will face in rendering an accurate accounting, once its other business and computer systems are otherwise in place as provided for under the HLIP. The connection between the missing-data problem and the "written policies and procedures" mandate is clear. An accounting, or reconciliation as is sometime used in the Trust Fund Management Reform Act, requires the gathering of necessary information and a mechanism to process that information into a form that can be reconciled with the existing funds. As the Acting Special Trustee testified, "[t]he records are the base for the entire trust operation." Trial Tr. at 3164. Congress was certainly aware of these documentation requirements when it passed the Trust Fund Management Reform Act. Indeed, inadequate document management was one of the top criticisms of Interior's handling of the IIM trust in terms of its eventual ability to render an accounting. *See* Pls.' Ex. 36, at 20 (showing the independent auditor's conclusion that Interior's "[r]ecords management is inconsistent and inadequate to ensure the proper filing and safekeeping of Trust Fund records to support trust financial activity"). Ordinarily, trust management activities are monitored through an audit of transactional records. Trial Tr. at 148. As the former Special Trustee testified, many of these necessary records are not currently available to Interior and therefore cannot currently be audited. Trial Tr. at 148. Thus, Congress was undoubtedly requiring Interior to establish a written document retrieval plan when it codi-

fied the "written plans and procedures" requirement in the Act.

The same connection applies to document retention and the "written policies and procedures" requirement. Clearly, the destruction of necessary trust documents will make defendants' statutory task of rendering an accurate accounting impossible. Interior must have a plan (not inconsistent with its declared duty to preserve necessary IIM-related trust documents at least until an accounting is rendered) clearly stating which documents it will keep and which it will destroy, or else plaintiffs will suffer irreparable injury because they will never be able to estimate how much of their own money is in the IIM trust. Accordingly, because a fundamental requirement of defendants' responsibilities in rendering an accurate accounting is retaining the documents necessary to reach that end, and because Congress has mandated that Interior establish written policies and procedures required to meet that goal, Interior must create and finalize a plan for the proper retention of all IIM-related trust documents necessary to render an accurate accounting.

(iii.) *Systems Architecture and Staffing*

The Trust Fund Management Reform Act's requirements that Interior establish proper written plans for document retrieval and retention are rooted in the common law and common sense rules that an accounting requires proper supporting documentation. Proper planning for architecture and staffing, like proper document retrieval and retention, are necessary for Interior to render an accurate accounting. Unlike the document-management planning requirements, however, the requirements of architecture and staffing plans are rooted more in Interior's history of IIM trust mismanagement and the context of the Trust Fund Management Reform Act's passage than derived from the common law. Given Interior's admitted historical deficiencies in IIM trust manage-

formation,' something expressly provided for in 25 U.S.C. § 162a."); Trial Tr. at 1684.

ment systems and practices, the admitted inconsistency of these systems' and practices' implementation nationwide, the dramatic reforms planned for trust management, the speed of the implementation of those reforms, the Trust Fund Management Reform Act's requirements of the rendering of an accounting, and the Act's requirement that written plans be established for functions necessary to render an accounting, it follows that Interior must create written plans for computer and business systems architecture.

"Architecture," as that term is used in the IIM trust management context, means the blueprint for how various computer systems interface (*e.g.*, TFAS and TAAMS) and how business practices will coalesce with the interfaced computer systems (*e.g.*, the anomalies generated by the interface of TFAS and TAAMS). Trial Tr. at 4395–96. The first component, what the court will term "computer systems architecture," is the blueprint for how the hardware, software, and data involved in each computer system used in each trust management entity will be interfaced in order to carry out the trust functions provided for under the Trust Fund Management Reform Act and the HLIP. The second component, what the court will call the "business-systems architecture," is the blueprint for how personnel responsible for trust management will assimilate and perform the functions required under the new technological systems' regime. This would include, for example, the ways in which current practices will be modified to meet the functions of the COTS version of TAAMS.

An architecture plan is a generally accepted step in information systems management. Trial Tr. at 4539. The establishment of a written architecture is critical for several reasons. *See* Pls.' Ex. 37, at 7 (showing GAO's conclusion that "without systems architecture, Interior lacks assurance that the [HLIP] provides an effective solution to long-standing problems."). First, a written

architecture will help prevent inconsistent developments of trust management functions. *See id.;* Pls.' Ex. 233, at 15. This is especially true given the projection that trust management will still be undergoing major reform beyond the next national election, which may include a change of administrations and, thus, trust management. Second, a written architecture necessitates that the systems and time lines developed to bring defendants into compliance with their statutory duties will be properly thought out. For example, one foreseeable obstacle for trust management reform is anomalous data among the interfaced computer systems. When TAAMS. and TFAS interface, for example, each system relies on the other for information necessary to carry out certain business functions, such as check issuance. When the data within the two computer systems do not properly interface—*e.g.*, information is transferred into the wrong field—then an anomaly is created. These anomalies are often placed on a separate error report and usually analyzed manually. Depending on the number of anomalies, the labor required to address these errors could place a drag on defendants' discharge of their trust duties, and thereby alter appropriate deadlines. Trial Tr. at 4534–37. An architecture would address these types of problems prospectively. Third, without an architecture, it will be much more difficult to estimate the amount of funding that must be sought in order to discharge Interior's trust duties. Trial Tr. at 4542. Given the necessity of a written architecture plan and the Trust Fund Management Reform Act's requirement that written policies and procedures be developed for functions necessary to the rendition of an accounting, the court declares that Interior has the duty to develop promptly such an architecture plan.

Like the architecture requirement, the "written policies and procedures" require-

ment of the Trust Fund Management Reform Act necessarily requires Interior to develop a plan for how the trust management operations under its new trust management system will be staffed. As impressive as Interior's new computer systems appear to be, these computer systems still depend upon the labor and skill of Interior's employees. Missing and backlogged information must be put into the computer systems. The information contained in and processed by the computer systems must be monitored and verified. Problems arising from the integration of the computer and business systems must be addressed. All of these (and many others) are logical planning requirements that are necessary for Interior's trust management duties to be properly and promptly discharged. Trial Tr. at 4458. Congress considered Interior's past staffing inadequacy serious enough to provide for adequate staffing in its own separate statutory provision. *See* 25 U.S.C. § 162a(d)(7) ("The Secretary's proper discharge of the trust responsibilities of the United States shall include … [p]roviding adequate staffing, supervision, and training for trust fund management and accounting."). Because proper staffing is a function necessary to the rendition of an accurate accounting under the Trust Fund Management Reform Act, the court declares that Interior has the duty to develop such a staffing plan.

C. *The Deadline for the Discharge of the Secretary of the Interior's Four Declared Planning Duties Has Passed*

With these four planning duties established, the issue then becomes whether Interior is currently in breach of any of these duties. While the specific issue of whether Interior has the necessary plans will be addressed below, *see infra* subpart V(D), Interior chiefly relies on timing arguments to rebut plaintiffs' claims of breach of statutory duty. First, Interior argues that the Trust Fund Management

Reform Act contemplates that the discharge of Interior's statutory duties would take place under deadlines set by the Special Trustee in his time line for implementation of the Strategic Plan. Second, Interior contends that Congress placed no explicit deadline in the Trust Fund Management Reform Act provisions and that whatever deadline may be implied has not yet passed. The court rejects both arguments.

Interior's first contention relies upon a misunderstanding of the purpose of the Special Trustee's timetable. This timetable was to be geared toward the reforms suggested in the Special Trustee's Strategic Plan, not the actions that the Secretary would decide to take arising from the Strategic Plan. *See* 25 U.S.C. § 4043(a)(2)(c) ("The [Strategic Plan] shall include … [a] timetable for implementing the reforms identified in the plan …."). Interior's actions have rendered any timetable that the Special Trustee may have created irrelevant and useless in terms of analyzing the reasonableness of defendants' progress. The Special Trustee's Strategic Plan, as defendants admit, called for two especially bold institutional changes that would not only have taken substantial amounts of time to carry out, but also that would have required legislation—the Indian Fiduciary Records Center and the Indian Development Bank. It is disingenuous at best for defendants to take the position that they can remove these portions of the plan, under which the Special Trustee's timetable was created, and then be governed by the same timetable while doing substantially less work. Moreover, as discussed below, the Trust Fund Management Reform Act gives the Special Trustee very little authority, given the Secretary's ultimate power to render final decisions. To argue that Congress intended, by virtue of the chain of command, the Secretary of the Interior to have unbridled authority over his own timetable in the implementation of these reforms is untenable. Accordingly, the

court rejects Interior's timing argument on this point.

■ Likewise, Interior's second argument, that any implied statutory deadline has not passed, also fails. The law is clear that although a statute may not explicitly provide a deadline for agency action, the APA itself imposes a statutory deadline of reasonableness. The APA provides this reasonableness deadline in two separate provisions. In 5 U.S.C. § 555(b), Congress provided that agencies must discharge their statutory duties "within a reasonable time"; correspondingly, Congress provided in 5 U.S.C. § 706(1) that courts "shall . . . compel agency action unlawfully withheld or unreasonably delayed."

■ Absent a precise statutory timetable or "other factors counseling expeditious action," an agency's control over its own timetable of statutory compliance is given "considerable deference." *Sierra Club v. Gorsuch,* 715 F.2d 653, 658 (D.C.Cir.1983). In determining whether a reasonable time for statutory compliance has passed, a court must assess and balance several factors. *See In re International Chemical Workers Union,* 958 F.2d 1144, 1149 (D.C.Cir.1992). First, the court must "ascertain the length of time that has elapsed since the agency came under a duty to act." *Id.* Second, the "unreasonableness of the delay must be judged in the context of the statute which authorizes the agency's action." *Id.* Third, the court must "examine the consequences of the agency's delay." *Id.* Fourth, the court must give "due consideration in the balance to 'any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.'" *Id.* (quoting *Cutler v. Hayes,* 818 F.2d 879, 897 (D.C.Cir.1987)).

■ Three "other factors" in this case require more expeditious agency action than might normally be required in the typical administrative law context. First, the nature of the IIM trust relationship

means that plaintiffs are helplessly relying on the trustee. *See Misplaced Trust,* Pls.' Ex. 1, at 5 ("The Indian trust fund is more than balance sheets and accounting procedures. These moneys are crucial to the daily operations of native American tribes and a source of income to tens of thousands of native Americans."). Plaintiffs are some of the poorest people in the nation. As defendants have often stated, plaintiffs rely upon the IIM trust as their bank. "[C]lose scrutiny of administrative action is particularly appropriate when the interests at stake are not merely economic interests in a license or a rate structure, but personal interests of life and health." *Wellford v. Ruckelshaus,* 439 F.2d 598, 601 (D.C.Cir.1971). Second, as Interior admits, within the statutory contours of their fiduciary trust duties toward plaintiffs, the United States "has undertaken an obligation of the highest responsibility and trust." Defs.' FF/CL, at 134 (quoting *Minnesota Chippewa Tribe v. United States,* 14 Cl.Ct. 116, 129 (1987) (quoting *Cheyenne–Arapaho Tribes v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390, 1392 (1975) (quoting *Seneca Nation of Indians v. United States,* 173 Ct.Cl. 917, 925 (1965)))). The government's conduct "should therefore be judged by the most exacting fiduciary standards." *Seminole Nation,* 316 U.S. at 297, 62 S.Ct. 1049. Third, the underlying purpose of giving "considerable deference" to an agency's own time line is diminished in this case. The Court of Appeals has noted that the source of this deference is the "agency's discretion to set its own priorities." *Gorsuch,* 715 F.2d at 658. Contrary to this threshold principle, however, the Trust Fund Management Reform Act was passed *because* Interior had abused the "considerable deference" that already had been given to it by Congress for over a century.

■ With this context in mind, the court must now turn to an analysis of the four determinative "unreasonableness" factors in analyzing whether Interior's four

planning duties declared under the Trust Fund Management Reform Act are past-due. First, no one can dispute the exceedingly great length of time that has passed since defendants came under the duty to properly manage the forcefully imposed trust over plaintiffs' lands and money. Interior's fiduciary duty to render an accounting cannot be judged as beginning in 1994 with the passage of the Trust Fund Management Reform Act, as defendant Babbitt recognized:

> Q: You recognize that there are trust responsibilities, I take it, which are—which predated and currently coexist with your statutory responsibilities.
>
> A: Yes.
>
> Q: An you would describe those as common law responsibilities.
>
> . . .
>
> [A:] Now. . . . Well, when I was in law school, common law referred to matter derivative out of English law, and I would say, for the most, the case law—I would say derivative of judicial decisions.
>
> Q: All right. And there is a significant portion of the Trustee's responsibilities for Indians that are derived from case decisions.
>
> A: Oh, absolutely.
>
> Q: Now, you have referred to the fact that this problem of the failure to discharge fiduciary responsibilities didn't begin with you. It's been around for a long time; isn't that right?
>
> A: Yes.

Trial Tr. at 3771–72. The most basic fiduciary duty imposed in a financial trust relationship must surely be the duty to render an accurate accounting. The court agrees that a century is, at best, a "long time" for plaintiffs to wait. Further, the delayed actions addressed today do not even address the ultimate accounting. Rather, today's decision focuses solely upon fundamental plans that must be created, as Congress foresaw, if an accurate accounting is ever to be rendered.

Second, the context of the Trust Fund Management Reform Act, which mandates expeditious action, shows the unreasonableness of the delays in agency action discussed below. Again, the entire purpose of the Act, passed five years ago, was to force Interior to take these types of basic trust-fund-management actions. The Trust Fund Management Reform Act itself was Congress's judgment that Interior's actions had been unreasonably delayed too long.

Third, the consequences of agency delay are great. The longer defendants delay in creating the plans necessary to render an accounting, the greater the chance that plaintiffs will never receive an actual accounting of their own trust money. For example, it is clear that the longer Interior waits to retrieve missing information, the less of that information will be available and able to be located. Interior cannot retrieve that missing information, as Congress foresaw, without creating a written plan for its retrieval. As time passes the risk increases that the only available (although not necessarily legally adequate) option for Interior will be a statistical sampling method. In that context, Interior's delayed planning causes the confidence level of any sampling technique to drop. In short, Interior's delayed action will cause irreparable injury to plaintiffs' right to receive an accounting and, ultimately, injury to their right to recover their own funds. The consequences of this irreparable injury are even clearer when put in the context of plaintiffs' reliance on income from the IIM trust and plaintiffs' treatment of the trust as their "bank." "[T]he interests at stake are not merely economic interests in a license or rate structure, but personal interests in life and health." *Public Citizen Health Research Group v. Auchter,* 702 F.2d 1150, 1156 (D.C.Cir. 1983) (mandating that the Assistant Secretary of OSHA issue a notice of proposed rulemaking within thirty days of the date of decision, and quoting *Wellford,* 439 F.2d at 601).

■ Fourth, the court must give due consideration to Interior's excuses for why it has not taken the basic remedial steps discussed below to discharge its statutory duties. Interior offers two justifications. First, Interior constantly emphasizes that its success is dependent upon proper budgeting. This argument, as discussed below, seems disingenuous given the lack of requests for proper funding until the institution of this lawsuit. More importantly, however, claims of lack of funding cannot be allowed to legally impair the United States' trustee-delegates' exacting fiduciary duties toward management of this trust. As Chief Judge Arnold of the Court of Appeals for the Eighth Circuit has stated:

> [T]he government may not avoid its trust duties on the grounds that the budget and staff of the Department of Interior are inadequate. This circumstance may well excuse any delay on the part of individual employees of the [BIA]. But the United States may not evade the law simply by failing to appropriate enough money to comply with it.

See *Loudner v. United States*, 108 F.3d 896, 903 n. 7 (8th Cir.1997); *see also Forest Guardians*, 174 F.3d at 1188 & n. 14 (holding that it would not accept defendant Babbitt's argument regarding unreasonable delay due to budgetary constraints in terms of breach of statutory duty but that, instead, "the agency defense of unavailable resources must be reserved as a defense against contempt if an injunction issues"). For these reasons, the court gives little weight to Interior's budgetary-constraints justification. Second, Interior constantly reminds the court that its discharge of its statutory duties cannot merely be obtained by "the stroke of a pen." Trial Tr. at 38. While the complexity of the tasks involved must be considered, certain basic mechanical functions, such as planning to retrieve missing documentation and properly staff the trust's management, are not the same types of issues usually considered to be complex in agency decision making. *See, e.g., In re Monroe Communications Corp.*, 840 F.2d 942, 946 (D.C.Cir.1988) (refusing to issue mandamus against agency for delayed agency action because the action required the complex balancing of "policy and constitutional concerns" tied to obscenity law). Thus, while there is a kernel of truth in Interior's justifications concerning the effects of inadequate funding and issue complexity, in the context of the IIM trust these arguments do not warrant great weight.

In sum, the court concludes that Interior's reasonable time to discharge the four specific fiduciary planning duties declared above has expired. Judged in the context of the exacting nature of defendants' fiduciary duties, the admitted "long" delay in discharging these duties, and the nature of plaintiffs' irreparable injuries, the court believes that this conclusion is inescapable. On the facts of this case, even five years would be an unreasonable amount of time to delay these five fundamental planning requirements.

D. *The Secretary of the Interior is Currently in Breach of Four Statutory Trust Duties that Warrant Prospective Relief*

1. *The Secretary of the Interior Has No Written Plan to Gather Missing Data*

Although Interior has established numerous high-level plans and has acquired and begun to implement effective new accounting and asset management systems, it currently has no final written statement of policies and procedures for recovering missing data—as opposed to data currently retained somewhere within the bowels of Interior but not yet processed—necessary to perform an accounting. Interior did present at trial Plaintiffs' Exhibit 238, which appears to be a draft document-cleanup plan, but that plan is neither finalized nor directed toward gathering missing information. *See supra* section II(E)(1). It is as though Interior believes that if the problem of missing documentation is ignored, it will simply go away or, at least,

be left for another administration to handle. Congress's purpose for placing this planning provision in the Trust Fund Management Reform Act, given the context of the Act's passage, was to prevent Interior from doing what it is now doing in this regard—delaying planning for the gathering of missing documentation necessary to render an accounting. Accordingly, because Interior has no such final plan, the court declares that Interior is currently in breach of this trust duty.

2. *The Secretary of the Interior Has No Written Plan Addressing the Retention of IIM–Related Trust Documents Necessary to Render an Accounting*

Interior has no finalized plan concerning the destruction of IIM-related trust documents necessary to discharge the defendants' statutory duty to render an accurate accounting. No such plan has been provided to the court, and there is no such plan in the administrative record. Just as the refusal to gather missing documentation necessary to render an accurate accounting will irreparably harm plaintiffs, the destruction of such information will have the same effect. Therefore, Interior must create and finalize a document destruction schedule consistent with the principle of retaining documents necessary to render an accurate accounting to plaintiffs of their IIM trust money.[34]

3. *The Secretary of the Interior Has No Written Architecture Plan*

The court has declared that the Trust Fund Management Reform Act placed upon Interior the duty to establish a written plan dealing with computer and business systems architecture. Contrary to this duty, however, Interior still has no such plan. It appears that Interior recognizes the value and importance of such a plan, because an architecture plan is currently being developed. *See* Pls.' Ex. 37,

at 22 ("The Department [of the Interior] does recognize the importance of an overall architecture .... Preliminary work on a system architecture has started ... and the beginnings of our future architecture are underway."). Because Interior currently has no written architecture plan, however, the court declares that Interior is currently in breach of this trust obligation owed to plaintiffs.

4. *The Secretary of the Interior Has No Written Plan Addressing the Staffing of Interior's Trust Management Functions*

The court has declared that the Trust Fund Management Reform Act requires Interior to establish a written plan for the staffing of IIM trust management functions. Contrary to this duty, however, Interior currently has no such plan. Interior has only established a written plan for the training of trust management employees. Training alone is simply one component of an adequate human resources analysis. Trial Tr. at 4457. A training plan does not address any of the concerns discussed above. *See supra* section V(B)(2). Additionally, there is an independent body currently performing a review of BIA staffing, but that review has not been finished, has not been transformed into any kind of staffing plan, and (presumably) will not address the changing staffing needs under the recently developed HLIP. Because Interior currently has no staffing plan as required, the court declares that Interior is currently in breach of this trust duty owed to plaintiffs.

VI. *Declaratory Judgment—The Secretary of the Treasury*

A. *The Secretary of the Treasury's Duty to Retain IIM–Related Trust Documents that are Necessary for the Rendition of an Accounting*

For the same reasons applicable to Interior, Treasury bears the fiduciary obli-

---

**34.** For a discussion of actual destruction of trust documents by Interior, see Report of the

Special Master (filed June 7, 1999).

gation to retain all IIM-related trust documents that are necessary for the rendition of an accurate accounting of plaintiffs' IIM trust money. The court will not re-state in full the basis for this requirement. In short, through the Trust Fund Management Reform Act, Congress codified the United States' duty to render an accurate accounting of the IIM trust. *See supra* Parts IV–V. A necessary derivative of this requirement is that documents necessary to render an accounting be retained. *See supra* section V(B)(2).

■ As both ·defendants admit, the United States is ultimately the trustee of the IIM trust. To discharge the United States' trust duties, Congress must delegate certain functions to the agencies. Although Congress has delegated a majority of the United States' trust management functions to Interior, it has also given Treasury certain trust responsibilities. For example, Treasury plays an important role in the holding and investing of plaintiffs' trust money. *See* 25 U.S.C. § 161a(b). To the extent that Treasury is involved in the IIM trust it is by the mandate of Congress, the settlor of the IIM trust, which ultimately establishes the contours of the United States' (and its delegates') fiduciary duties. *See Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961. To the extent that Congress has placed duties upon Treasury, the function of those duties is to discharge the United States' fiduciary obligations. *See* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 225 (1982) ("Since the trust obligations are binding on the United States, these standards of conduct would seem to govern all executive departments that may deal with Indians, not just those such as the Bureau of Indian Affairs which have special statutory responsibilities for Indians affairs."). Consistent with Treasury's role as a trustee of the IIM trust for certain statutorily based functions, and in light of the common-law

duty for a trustee to retain trust documents necessary to protect the beneficiaries' rights under the trust relationship, the statutory scheme at issue leads to the conclusion that Treasury, like Interior, must retain trust documents necessary to render an accurate accounting to plaintiffs of all IIM trust money.

B. *The Secretary of the Treasury Has Breached His Fiduciary Duty to Retain IIM–Related Trust Documents and Has No Remedial Plan to Address This Breach of Duty*

■ Treasury has admitted that it has treated IIM trust material the same as general records by destroying them after their age exceeded six years and seven months, without regard to the fact that the United States (through its trustee-delegates) has not rendered an accounting of plaintiffs' IIM trust money.[35] This policy is a breach of plaintiffs' right to have retained the documents necessary to allow the United States to render an accounting.

As discussed above, Treasury has stipulated that it will consult with Interior to identify IIM-related trust documents "maintained or created" by Treasury "necessary to meet the government's trust obligations" and that, after this consultation, Treasury will submit a proposed revised document destruction schedule to the Archivist of the United States. Stipulation of Department of Treasury, filed July 6, 1999, at 2. Until that time, Treasury has agreed, to plaintiffs' satisfaction, to preserve certain enumerated categories of IIM-related trust documents. *See* Stipulated Order of Aug. 12, 1999 (regarding Treasury Department IIM-related trust records). The dispute then is limited to post-trial destruction.

The destruction of IIM-related trust documents necessary to render an accurate accounting would violate plaintiffs' trust right to the preservation of these

**35.** For a discussion of recent destruction of potentially necessary IIM-related trust documents by Treasury, *see* Pls.' Ex. 152 (disclosing the destruction of potential IIM documents).

documents. *See supra* Parts V–VI. Because Treasury has no current post-trial schedule for the retention of necessary IIM-related trust documents that it has created or that it maintains, the court will direct Treasury, after it consults with Interior as provided in the stipulation, to create a comprehensive document retention plan that deals with IIM-related trust documents. Such a plan has already been created for the purposes of this litigation in negotiations between plaintiffs and Treasury. It may very well be that the agreement reached in that instance would satisfactorily discharge Treasury's duty to retain these documents beyond this litigation. The court will, however, leave that to Treasury to decide in the first instance.

## VII. *Plaintiffs' Obstruction Claims*

Defendants correctly point out that plaintiffs have all but withdrawn their claims for "obstruction" of the discharge of the Special Trustee's duties by defendant Babbitt's meager funding requests and re-organization of OST. In their proposed findings of fact and conclusions of law, plaintiffs do not even propose a conclusion of law that would grant them relief were such claims of obstruction proved.

Plaintiffs' obstruction allegations appear to have been shifted toward an argument for this court to appoint an independent special master over the management of the IIM trust and away from bases for independent causes of action. In his closing, plaintiffs' counsel compared Interior's historic unfulfilled promises to fix the IIM trust system to the situation where, in the Peanuts cartoon, Lucy would repeatedly promise to let Charlie Brown kick the football but, contrary to her earlier promise, just as often move the football immediately before Charlie Brown could kick it. Trial Tr. at 5065. In this context, plaintiffs stated that "[t]he important point now is not whether there was some actionable interference with the Special Trustee, but rather the bearing [Interior's] behavior towards the Special Trustee has upon the extent to which we can be sure that that football doesn't get moved away." Trial Tr. at 5065. Thus, even plaintiffs appear to concede that they have not proved actionable claims of interference.

To the extent that plaintiffs have not withdrawn these obstruction claims, the court agrees that these claims must be denied. First, plaintiffs' budget-request claim fails. Although Interior never requested funding in an amount that would have promptly brought defendants into compliance with the statutory mandates of the Trust Fund Management Reform Act and allowed the Special Trustee to discharge his duties, Interior has persuasively shown that a combination of OMB budget cuts and the era of budget cutbacks undoubtedly guided, at least in part, Interior's budget requests at that time. While defendants' meager funding requests may be relevant to this court's ultimate decision on the proper remedy in this case, they do not in and of themselves prove action contrary to law. Of course, the ultimate effects of these funding requests have been and will be reviewed in the results that defendants achieve. Again, defendants may not evade their trust responsibilities on the grounds that their budget and staffing is inadequate. *See Loudner*, 108 F.3d 896, 903 n. 7.

Similarly, the court will deny plaintiffs' claim of obstruction as to defendant Babbitt's reorganization of OST because plaintiffs appear to have withdrawn this claim as an independent action, they have not proposed any prospective remedy as a result of any such obstruction, and they have not otherwise proved that defendant Babbitt took any action contrary to law. The court agrees with plaintiffs that defendant Babbitt's decision, without any input from or notice to the Special Trustee, to alter the chain of command between the Special Trustee and his own employees and transfer one of the Special Trustee's Senior Executive Service Special Assistants frustrated the legislative intent of some key figures behind the passage of the Trust

Fund Management Reform Act. There is no question that the creation of OST, as a general matter, was intended to place a more independent bureau within Interior in order to get results that had not been received under the sole reign of BIA and former Secretaries of the Interior. The way in which defendant Babbitt's decision was made has now relegated the OST to just another of Interior's bureaus, largely stripped of any independence that it may have had with regard to the IIM trust. Nonetheless, the court cannot say that defendant Babbitt's poor decision was contrary to law. Despite the best intentions of some lawmakers, the text of the statute they enacted said in no uncertain terms that "the Special Trustee ... shall report ... to the Secretary." 25 U.S.C. § 4042. If Congress truly wanted a completely independent trustee to oversee trust management, entirely independent from the well-documented historic recalcitrance of Interior, then Congress surely would have explicitly restricted the Secretary's powers over the Special Trustee and his office.

To the contrary, defendant Babbitt correctly claims that his decision was lawful given the powers vested in him by a combination of the Reorganization Plan No. 3 of 1950 and 5 U.S.C. § 903. In 5 U.S.C. § 903, Congress empowered the President to "prepare a reorganization plan specifying the reorganizations he finds are necessary." 5 U.S.C. § 903. Specifically, this statute allows the President to create a plan that provides for "the authorization of an officer to delegate any of his functions." *Id.* § 903(a)(5). In the President's Reorganization Plan No. 3 of 1950, the Secretary of the Interior was transferred "all functions of all agencies and employees of [his] Department," with the exception of two powers not applicable to this case. Reorganization Plan of 1950 § 1, 5 U.S.C.App. 1. In the same Act, the President authorized the Secretary to "made such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of the Interior of

any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan," and to "effect such transfers within the Department of the Interior of any ... personnel ... as he may deem necessary in order to carry out the provisions of this reorganization plan." Reorganization Plan of 1950 §§ 2 & 3, 5 U.S.C.App. 1. In short, given the broad authority given to the Secretary of the Interior to organize his department as he wishes, the lack of any mention in the Trust Fund Management Reform Act as to limiting the Secretary's broad powers in this respect, and the Trust Fund Management Reform Act's provision that the Special Trustee must report to the Secretary, the court will deny plaintiffs' claim of unlawful obstruction of the Special Trustee's duties through the Secretary's reorganization of OST. Defendant Babbitt's decisionmaking process was poor given OST's independent purpose; his decision and the way it was made were not, however, contrary to law.

## VIII. *Remedy*

One of plaintiffs' primary goals in the prospective component of this litigation is to have the IIM trust put under court supervision. Plaintiffs' requests range from receivership to a Special Monitor with investigatory powers. The government, on the other hand, takes the position that it is not in breach of any trust duties and, even if it is, there is already sufficient supervision of the IIM trust to warrant the court's denial of all continuing supervision requests.

The court has the authority to appoint a Special Master or a monitor to oversee defendants' discharge of their statutory duties. In addition to its inherent equitable powers, the court is granted this authority by Rule 53 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1651(a), the All Writs Act. Under Rule 53, the court could appoint a special master upon a finding of "exceptional circumstances"

warranting such an appointment. FED. R. CIV. P. 53; *see also Organization for Reform of Marijuana Laws v. Mullen,* 828 F.2d 536, 542 (9th Cir.1987). Under the All Writs Act, this court "may issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

The court has rejected defendants' position that they have breached no trust duties. Defendants' position that the court should simply allow them to carry out their duties under the same supervision that has brought them to this point cannot prevail. As summarized in this court's Memorandum Opinion of June 7, 1999 and in the seminal congressional report on IIM trust mismanagement, *Misplaced Trust,* defendants have been told by Congress and begged by plaintiffs for decades to correct the errors stemming from defendants' century-long reign of mismanagement. *See Misplaced Trust,* Pls.' Ex. 1, at 15–27 (detailing Interior's consistent "failure to comply with congressional directives"). Despite congressional, GAO, Inspector General, and independent agency reports heavily criticizing almost every aspect of IIM trust management, defendants are now, for the first time, beginning to comply with many of their fiduciary duties. *See, e.g.,* Pls.' Ex. 1, at 214: ("Mr. Chairman, I certainly don't need to outline for you [and] Members of this Subcommittee the long and sorry history of the Department's mismanagement of the Indian Trust Funds. These problems existed before we were born.") (Statement of Secretary Babbitt). This "long and sorry" record of recalcitrance, to use defendant Babbitt's own words, is something that defendants do not even pretend to dispute, as seen by the testimony at trial of Secretary Babbitt:

> Q: Now, you have referred to the fact that this problem of the failure to discharge fiduciary responsibilities didn't begin with you. It's been around for a long time; isn't that right?

> A: Yes.

> Q: And based on your study or investigation into this, are you aware that for decades there have been dozens of government reports, congressional hearings and findings, IG reports, GAO reports and others, that have criticized Department of Interior's management of its trust responsibilities; are you aware of that?

> A: Yes

> Q: And that they have repeatedly recommended solutions or proposals to solve this problem; are you aware of that?

> A: I am.

> Q: And are you also aware of the fact, Mr. Babbitt, that few, if any, of these proposals have ever been implemented, which is why you've got the problem you're dealing with today; isn't that true?

> A: I would only add that there have been some proposals that were put forth and implemented, but by and large, not many, and the problems certainly continued to accumulate.

Trial Tr. at 3772–73. Defendants' cry of "trust us" is offensive to the court and insulting to plaintiffs, who have heard that same message for over one hundred years. While plaintiffs chose to analogize defendants' allocution to Lucy pulling away the football from Charlie Brown, the court wonders if the tale of *The Little Boy Who Cried Wolf* would not have been more appropriate—when the same insincere statement is made time and again, the sincere statement is nearly impossible to discern and impossible to rely upon.

Despite their frustrations, however, plaintiffs must remember that they have brought a lawsuit. As in all cases, the judicial branch must consider not only the parties' rights and correlative obligations, but also constitutional concerns such as separation of powers. As the Supreme Court has stated:

[Aggrieved parties] cannot seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the Department [of the Interior] or the halls of Congress, where programmatic improvements are normally made. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (emphasis in original). The court cannot simply take over the role of the agency or bring all actions of defendants under its authority. Courts cannot "become ... enmeshed in the minutiae" of agency administration. *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Courts generally have become involved in administrative programs in the way plaintiffs request only in the case of constitutional or quasi-constitutional violations (*i.e.,* Title VII or 42 U.S.C. § 1983 cases) or in order to enforce a court order in the case of contempt. *See Local 28 of Sheet Metal Workers Int'l Ass'n v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344(1986) (upholding the appointment of a Special Master "in light of the difficulties inherent in monitoring compliance with the court's orders, and especially petitioners' established record of resistance to prior state and federal court orders designed to end their discriminatory membership practices."); *Mullen,* 828 F.2d at 546 (upholding the appointment of a Special Master to protect Fourth Amendment rights in an action brought under 42 U.S.C. § 1983); *Gary W. v. State of Louisiana,* 601 F.2d 240, 244–45 (5th Cir.1979) (upholding the appointment of a Special Master when defendants had failed to come into compliance with judicial order for a period of four years).

On the other hand, defendants have the type of historical record of recalcitrance that troubles the court. The court is aware that defendants, especially Interior, has made promises similar to those relied upon today each time that it has come up for review on the IIM trust. Indeed, these broken promises are what necessitated the passage of the Trust Fund Management Reform Act. Promises made in court, however, are different than the puffing to Congress that Interior has done over the past few decades. The court can ensure that these promises are kept, and it has the contempt power that will allow it to do so when appropriate.

Despite defendants' history, the court has decided to give defendants one last opportunity to carry through on their promises. The HLIP, defendants' most comprehensive plan to eventually bring themselves into compliance with their duty to render an accurate accounting, is a substantial step in the right direction, as even plaintiffs admit. This time, there is substance to support defendants' promises. The court feels that it is therefore its constitutional duty to allow defendants the opportunity to cure the breaches of trust declared in this Memorandum Opinion. Given separation of powers concerns, the court will deny for the time being plaintiffs' request to appoint a receiver or Special Master over the IIM trust. Should the court find in the future upon proper motion by plaintiffs that defendants have been less than truthful in their representations or that defendants' adherence to prompt remedial action turns out to have been feigned, then the court may well decide to exercise its authority to ensure that its orders are carried out.

▮▮▮▮ For the time being, the court will give the government, perhaps for the last time in this case, the benefit of the doubt. The court will declare the statutorily based trust rights of plaintiffs under the IIM trust as described above, declare that defendants have breached their trust duties in certain specific respects that warrant prospective relief, and remand the administrative record to the Department of the Interior and the Department of the Treasury for further proceedings not inconsistent with this Memorandum Opinion.[36] Further, to ensure that these steps

---

**36.** When agencies commit errors of law, those

agencies usually have "discretion to deter-

are taken promptly, and to ensure that the other various actions that defendants have represented would be taken are in fact taken, the court will assert continuing jurisdiction over this case. Through this mechanism, the court can ensure defendants' future compliance with their trust duties under the Trust Fund Management Reform Act "without having to speculate over the possibility of further agency delays." *In re Center for Auto Safety*, 793 F.2d 1346, 1354 (D.C.Cir.1986). Moreover, the court will not be unduly intruding into the role of the Executive branch.

The court emphasizes, however, that it would not be an abuse of discretion to appoint a Special Master or Monitor to closely check defendants' progress toward bringing themselves into compliance with their trust duties. After all, defendants have shown their historic inability to keep their promises with regard to trust management reform and their unwillingness to comply with court orders. Defendants have already been cited for civil contempt of court in this case for the failure to obtain and produce relevant trust documents, an obligation which has been declared today as a permanent trust duty under the Trust Fund Management Reform Act. That failure to abide by court decree, which the court has characterized as the most egregious governmental misconduct that it has ever seen, has already led to the appointment of a Special Master to monitor compliance with defendants' discovery duties. Defendants are but one step away from earning more involved court oversight over the IIM trust, such as another Special Master or Monitor, should they fail to live up to their own representations or fail to abide by the court's order issued this date.

Nevertheless, it is apparent to the court that the contempt trial and the court's sanctions have had a salutary effect on the defendants. Indeed, both Secretary Babbitt and Assistant Secretary Gover testified about the current unique opportunity for defendants to bring themselves into compliance with their trust duties, given the added involvement of the court. Trial Tr. at 3756 ("There's no denying that the involvement of this Court has helped this process, and I acknowledge that.") (Statement of Secretary Babbitt); 3806 ("This ship has been through a lot of storms already, it's had the sails ripped off the riggings and we've put them back on. And it's been off course, and we've steered it back with a lot of help from lots of people, including this Court, and we are proceeding toward that safe harbor and it is my considered judgment that there is in these kinds of things a kind of critical momentum—there's a—there's a point at which you have finally invested enough money, enough people, enough of a stake from the Congress, from all three branches of government that it—that the probabilities of making it into that harbor are really quite predictable.") (Statement of Secretary Babbitt); 3806 ("At the kind of stage this project is at, with the investment, the [c]ongressional attention, the rise of effective lobbies in Indian country, the life tenure of Federal judges . . . this one's going into a safe harbor.") (Statement of Secretary Babbitt); 1156 ("The [BIA] is under a lot of pressure to make this happen. The [BIA] is under pressure from the Congress. The [BIA] is under pressure from my boss, the Secretary, and from OMB and from this Court, and what we have is—for the first time that I am aware of, you have all three branches of Government actually joined in an objective, and that is what creates a unique opportunity. There is no opposition to movement forward on [IIM trust management reform] of which I am aware, and so it is

mine in the first instance 'how to bring themselves into compliance.' " *Global Van Lines, Inc. v. Interstate Commerce Commission*, 804 F.2d 1293, 1305 n. 95 (D.C.Cir.1986). To afford the agencies the opportunity to rectify their errors, "the proper course is to remand the case for further agency consideration in harmony with the court's holding." *Id.* (citations omitted).

unique and I don't know that we'll have this opportunity again.") (Statement of Assistant Secretary Gover). Moreover, defendants legitimately point out that more intrusive court involvement may lead to conflicting directions and thereby create a drag on defendants' discharge of their duties. *See* Trial Tr. at 3756 ("Well, I will be totally honest. There's no denying that the involvement of this Court has helped this process, and I acknowledge that. I'm a little concerned, like Tommy Thompson [, the Acting Special Trustee], about too many injunctions out against the employees. The reason is that they're good people, but they get scared to death to the point that they don't do anything unless there's a lawyer by their side.") (Statement of Secretary Babbitt).

In short, although the court believes that it would be acting within its discretion to appoint a monitor at this time, the court concludes that it should stay its hand for the time being and give defendants one final opportunity to prove that this time they truly mean what they say and that they will act in accordance with their own representations and the court's order issued this date. Should defendants fail, the court will still have continuing jurisdiction over the matter and can take any action necessary to force defendants to comply with their representations and the court's order. Defendants, at several points during the trial, candidly recognized that because of the lifetime tenure of federal judges, the court is the one branch of government that can successfully ensure that trust reform is carried out, should the other two branches of government fail to work together cooperatively to carry out this effort. *See, e.g.,* Trial Tr. at 3806 (Statement of Secretary Babbitt). This court intends to be diligent in its effort to ensure that trust reform is successfully completed but to exercise its power judicially and with appropriate deference and respect for the other two branches of government.

In light of these conclusions, and to ensure that defendants diligently take steps to bring themselves into compliance with their statutory trust duties, the court will retain continuing jurisdiction over this matter for a period of five years, subject to any motion for enlargement of time that may be made, and will order as follows:

1. Beginning March 1, 2000, defendants shall file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust.

2. Each quarterly report shall be limited, to the greatest extent practical, to actions taken since the issuance of the preceding quarterly report. Defendants' first quarterly report, due March 1, 2000, shall encompass actions taken since June 10, 1999.

3. Defendants Secretary of the Interior and Assistant Secretary of the Interior—Indian Affairs shall file with the court and serve upon plaintiffs the revised or amended High Level Implementation Plan. The revised or amended HLIP shall be filed and served upon completion but no later than March 1, 2000.

4. Defendants shall provide any additional information required by the court to explain or supplement defendants' submissions. Plaintiffs may petition the court to order defendants to provide further information as needed if such information cannot be obtained through informal requests directly to defendants.

5. The court will deny plaintiffs' requests for prospective relief that have not already been granted by the corresponding order. The court has based much of its decision today—especially the denial of more extensive prospective relief—on de-

fendants' plans (in both substance and timing) to bring themselves into compliance with their trust duties, both declared and provided for explicitly by statute. These plans have been represented to the court primarily through the HLIP, but also through the representations made by government witnesses and government counsel. Given the court's reliance on these representations, the court will order defendants, as part of their quarterly status reports, to explain any changes made to the HLIP or to its implementation. Should plaintiffs believe that they are entitled to further prospective relief based upon information contained in these reports or otherwise learned, they may so move at the appropriate juncture. Such a motion will then trigger this court's power of judicial review.

## IX. *Certification of Order for Interlocutory Appeal*

28 U.S.C. § 1292(b) provides the court with the authority to certify for interlocutory appeal today's order:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order. *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). Much of the relief granted today may be injunctive in nature

and therefore "otherwise appealable" for the purposes of 28 U.S.C. § 1292(b). *See id.* § 1292(a)(1) (providing that an order granting or denying a request for an injunction is immediately appealable). However, the court's order also involves other matters that may not be immediately appealable by both sides, such as the declaratory relief and the court's remand of the administrative record to the agencies. To the extent that the court's order is not "otherwise appealable," the order will be certified for interlocutory appeal. The court will find that it is of the opinion that this order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of this litigation. Other proceedings in this matter shall not be stayed during the pendency of any interlocutory appeal that is taken.

## X. *Conclusion*

Although plaintiffs may be dissatisfied with the court's decision to not appoint another Special Master or Monitor at this time, plaintiffs should take great satisfaction in the stunning victory that they have achieved today on behalf of the 300,000–plus Indian beneficiaries of the IIM trust. Plaintiffs have established their entitlement to ongoing judicial review of trust reform efforts for the next five years—or longer if necessary—and a role for their own continued, close involvement in reform efforts. That is enough for today. If more becomes necessary, the court will be available. If the defendants carry out what they now say that they will do and comply with the court's order issued this date, more should not be necessary. In that case, trust reform should become a reality rather than a dream.

## ORDER

For the reasons stated in the court's corresponding Memorandum Opinion is-

sued this date, the court HEREBY ORDERS as follows:

### I. *Dismissal of Certain Claims*

1. Plaintiffs' common-law claims are HEREBY DISMISSED with prejudice.

2. Plaintiffs' claims for obstruction or interference with the Special Trustee are HEREBY DISMISSED with prejudice.

### II. *Declaratory Judgment*

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. §§ 702 & 706, the court HEREBY DECLARES that:

1. The Indian Trust Fund Management Reform Act, 25 U.S.C. §§ 162a *et seq.* & 4011 *et seq.*, requires defendants to provide plaintiffs an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited.

2. The Indian Trust Fund Management Reform Act, 25 U.S.C. §§ 162a *et seq.* & 4011 *et seq.*, requires defendants to retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

3. To the extent that prospective relief is warranted in this case and to the extent that the issues are in controversy, it has been shown that defendant Bruce Babbitt, Secretary of the Interior, and defendant Kevin Gover, Assistant Secretary of the Interior, owe plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to:

(a) establish written policies and procedures for collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust;

(b) establish written policies and procedures for the retention of IIM-related trust documents necessary to render an accurate accounting of the IIM trust;

(c) establish written policies and procedures for computer and business systems architecture necessary to render an accurate accounting of the IIM trust; and

(d) establish written policies and procedures for the staffing of trust management functions necessary to render an accurate accounting of the IIM trust.

4. To the extent that prospective relief is warranted in this case and to the extent that the issues are in controversy, it has been shown that defendant Lawrence Summers, Secretary of the Treasury, owes plaintiffs, pursuant to the statutes and regulations governing the management of the IIM trust, the statutory trust duty to retain IIM trust documents that are necessary to render an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs.

5. Defendants are currently in breach of the statutory trust duties declared in subparagraphs II(2)-(4).

6. Defendants have no written plans to bring themselves into compliance with the duties declared in subparagraphs II(2)-(4).

7. Defendants must promptly come into compliance by establishing written policies and procedures not inconsistent with the court's Memorandum Opinion that rectify the breaches of trust declared in subparagraphs II(2)-(4).

8. To allow defendants the opportunity to promptly come into compliance through the establishment of the appropriate written policies and procedures, the court HEREBY REMANDS the required actions to defendants for further proceedings not inconsistent with the court's Memorandum Opinion issued this date.

### III. *Continuing Jurisdiction and Further Proceedings*

To ensure that defendants are diligently taking steps to rectify the continuing breaches of trust declared today and to ensure that defendants take the other actions represented to the court upon which the court bases its decision today, the

court will retain continuing jurisdiction over this matter for a period of five years, subject to any motion for an enlargement of time that may be made. Accordingly, the court ORDERS that:

1. Beginning March 1, 2000, defendants shall file with the court and serve upon plaintiffs quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared today and to bring themselves into compliance with their statutory trust duties embodied in the Indian Trust Fund Management Reform Act of 1994 and other applicable statutes and regulations governing the IIM trust.

2. Each quarterly report shall be limited, to the extent practical, to actions taken since the issuance of the preceding quarterly report. Defendants' first quarterly report, due March 1, 2000, shall encompass actions taken since June 10, 1999.

3. Defendants Secretary of the Interior and Assistant Secretary of the Interior—Indian Affairs shall file with the court and serve upon plaintiffs the revised or amended High Level Implementation Plan. The revised or amended HLIP shall be filed and served upon completion but no later than March 1, 2000.

4. Defendants shall provide any additional information requested by the court to explain or supplement defendants' submissions. Plaintiffs may petition the court to order defendants to provide further information as needed if such information cannot be obtained through informal requests directly to defendants.

5. The court DENIES plaintiffs' requests for prospective relief that have not already been granted by this order. The court has based much of its decision today—especially the denial of more extensive prospective relief—on defendants' plans (in both substance and timing) to bring themselves into compliance with their trust duties declared today and provided for explicitly by statute. These plans have been represented to the court primarily through the High Level Implementation Plan, but also through the representations made by government witnesses and government counsel. Given the court's reliance on these representations, the court ORDERS defendants, as part of their quarterly status reports, to explain any changes made to the HLIP. Should plaintiffs believe that they are entitled to further prospective relief based upon information contained in these reports or otherwise learned, they may so move at the appropriate juncture. Such a motion will then trigger this court's power of judicial review.

IV. *Certification of Order for Interlocutory Appeal*

For the reasons stated in the court's accompanying Memorandum Opinion, and pursuant to 28 U.S.C. § 1292(a)(4), the court HEREBY FINDS that it is of the opinion that this order involves controlling questions of law as to which there is substantial ground for difference of opinion. An immediate appeal of the court's order may materially advance the ultimate termination of the litigation. Accordingly, the court HEREBY CERTIFIES this order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Further proceedings in this case shall not be stayed during the pendency of any interlocutory appeal that may be taken.

SO ORDERED.

*MEMORANDUM AND ORDER*

Plaintiffs have advised this court that they have decided that the mediation ordered by this court on October 14, 1999, has no hope of success. Accordingly, that mediation is hereby terminated. The stay of issuance of the court's Memorandum Opinion regarding the trial that concluded in July 1999, is hereby VACATED. All other provisions (including the requirements of confidentiality) of the October 14, 1999, order shall remain in full force and effect.

Plaintiffs, on December 10, 1999, filed a motion to reopen the Trial record to file the Special Master's Report of December 3, 1999, and to take discovery into the matters raised in the Special Master's Report, regarding late notification of the destruction of 162 boxes of potentially relevant Treasury Department files. The court finds that the new evidence plaintiffs seek to add is essentially cumulative, and the relevant points arising from such evidence have been adequately considered by the court and are adequately set forth in the trial record. This new evidence will not affect the outcome of the trial—which this court can easily determine since this was a bench trial—and there is simply no reason for another delay of weeks—or likely months for preparation of a Supplemental Report and comments thereon by all interested persons, and responses thereto—before this court moves on to the next phase of this litigation. Accordingly, plaintiffs' motion is DENIED.

In denying plaintiffs' motion, this court intends in no way to denigrate its view of the government's misconduct regarding the 162 boxes incident, as noted in the court's December 6, 1999, order placing the Special Master's Report on the public record. Nevertheless, this court has ample power to deal with such misconduct, as this court has demonstrated in the past, and to hold accountable those individuals and agencies who are responsible for the misconduct. All of that has been fully taken into account in today's ruling on the trial, since the basic contours of the misconduct were all known at the time of the trial and the new Special Master Report simply adds cumulative information.

SO ORDERED.

A separate order shall issue this date.